626 So.2d 707 (1993)
STATE of Louisiana
v.
Clarence TUCKER.
Nos. 92-KO-2093, 92-K-2130.
Supreme Court of Louisiana.
May 24, 1993.
Dissenting Opinion June 1, 1993.
Rehearing Granted June 25, 1993.
Rehearing Denied November 18, 1993.
*708 Clarence Tucker, pro se.
Richard Ieyoub, Atty. Gen., Paul Carmouche, Dist. Atty., Catherine M. Estopinal, Asst. Dist. Atty., for respondent.
Dissenting Opinion of Justice Dennis June 1, 1993.
KIMBALL, Justice.[*]
We granted the State's writ application[1] in this matter to resolve a split among the circuits regarding the moment when, during a police encounter, a citizen becomes "seized" within the meaning of La. Const. Art. I, Sect. 5. Specifically, we address the impact, if any, of the recent United States Supreme Court decision in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) on an individual's rights against unreasonable searches and seizures in the State of Louisiana. In the consolidated matter, we granted the defendant's pro se writ application[2] to assess his claim that the evidence introduced at trial was insufficient to support his conviction.

FACTS AND PROCEDURAL HISTORY
This case involves charges stemming from two separate, unrelated incidents, occurring some three days apart. The first incident began at approximately 3:30 a.m. on February 28, 1990. On that date and at that time, Shreveport Police received a report of an attempted burglary in progress in the 4500 block of Ledbetter Street in Shreveport. *709 The caller reported that she had scared the burglar, a black male, and that he had run to a motorcycle in the street in front of her residence.
Shreveport Police Officer Richard Kenner responded to the call within minutes and saw a black male standing beside a motorcycle at the described location. As Officer Kenner approached he recognized the black male as Clarence Tucker, Officer Kenner having had previous dealings with Tucker. Officer Kenner recalled that Tucker was known for carrying one or more concealed handguns and as Officer Kenner approached he could see a bulge in Tucker's right jacket pocket. Based on these facts, Officer Kenner conducted a brief pat-down search of Tucker. This search revealed a .25 caliber automatic pistol, a plastic bag containing 26 rolled marijuana cigarettes, a single edged razor-blade, a number of small plastic bags, and considerable cash. Tucker was arrested for possession of a firearm by a convicted felon (La.Rev.Stat. 14:95.1) and possession of marijuana with intent to distribute (La.Rev.Stat. 40:966(A)(1)).
Three days later, on March 2, 1990, acting on repeated complaints of drug-related activity in and around Roby's Arcade, Shreveport and Louisiana State Police conducted a drug sweep of this area. This sweep was part of an ongoing police action, code-named "Operation Thor," which had as its goal reclaiming certain high-crime areas from drug trafficking and gang-related activities. The sweep began at around 10:30 p.m. when approximately ten to twelve marked police vehicles carrying 20 to 30 officers converged on Roby's Arcade. Shreveport Police Officer C.W. Wilson and State Police Officer Steven Jackson approached Roby's in the lead marked police cruiser.
As Officers Wilson and Jackson approached, they observed Tucker and another man standing huddled together by a parked car outside the Arcade. When the two men noticed the approaching police cars, they quickly broke apart and began to leave the scene. As they did, Officer Wilson stopped his car and began to get out while simultaneously ordering the two men to "halt" and "prone out." One of the men lay down immediately. Tucker, however, moved several steps toward the rear of the Arcade and tossed away a plastic bag. He then obeyed the police command and lay down. The police retrieved the bag Tucker had thrown and found it contained 47 rolled marijuana cigarettes. Tucker was then placed under arrest for possession of marijuana with intent to distribute.
As a result of these two incidents, Tucker was charged with and convicted of two counts of possession with intent to distribute a controlled dangerous substance (La.Rev.Stat. 40:966(A)(1)), count one arising from the February 28 incident and count two arising from the March 2 incident. The district court found Tucker a third felony offender on count one and, as such, sentenced him to 25 years at hard labor. The court also sentenced Tucker to 25 years at hard labor on count two with the sentences to run concurrently. Tucker appealed.[3]
Addressing count one, the appellate court found the police detention and pat-down search of Tucker lawful based on the arresting officer's reasonable, articulable suspicions that Tucker had been involved in a reported crime and that Tucker, who this Officer personally knew frequently carried concealed handguns, appeared to be carrying a handgun at this time. Thus, the court concluded, the marijuana found in Tucker's possession pursuant to this search had been lawfully seized and was not improperly admitted into evidence against Tucker at his trial. The appellate court further found the evidence presented against Tucker was sufficient to allow a reasonable trier of fact to conclude beyond a reasonable doubt that Tucker was guilty of the offense of which he was convicted. Accordingly, Tucker's conviction on count one was affirmed.
Addressing count two, the appellate court found Tucker was seized when Officers Wilson and Jackson approached and ordered Tucker to "halt" and "prone out," commands which, the appellate court surmised, would cause a reasonable person to believe detention was imminent. The appellate court further *710 found the police lacked reasonable, articulable suspicion that Tucker was engaged in, was about to engage in, or had just completed engaging in criminal conduct at the moment when he was seized and, therefore, this seizure was unconstitutional under La. Const. Art. 1, Sect. 5. Because Tucker discarded the plastic bag containing the marijuana cigarettes after this unlawful seizure, the court of appeal found the marijuana was a fruit of Tucker's unlawful seizure and, hence, was inadmissible. Accordingly, the appellate court reversed the trial court's denial of Tucker's motion to suppress this evidence and reversed Tucker's conviction on count two.
Tucker's pro se writ application (92-KO-2093) seeks review of the appellate court's conclusion that the evidence presented against him was sufficient to support his conviction on count one. The State's writ application (92-K-2130) seeks review of the appellate court's conclusion that the bag of marijuana which Tucker threw away as he was being ordered to halt and prone out was inadmissible against him. We first address the State's writ application.

APPLICABLE LAW
La. Const. Art. 1, Sect. 5 provides in part:
Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search.
Implementing the protections provided by this provision, this court has held the police may not make a warrantless arrest of a citizen without probable cause that the citizen has engaged in criminal conduct. State v. Zielman, 384 So.2d 359, 363 (La.1980); State v. Tomasetti, 381 So.2d 420, 423 (La. 1980); State v. Mendoza, 376 So.2d 139, 141 (La.1979). We have further held that while the police may briefly detain and interrogate an individual, a less encroaching intrusion on an individual's right to be free from governmental interference than an arrest, the police may only do so based upon reasonable, articulable suspicion that the individual has engaged in, is engaging in, or is about to engage in criminal conduct. La.Code Crim. Proc. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Andrishok, 434 So.2d 389, 391 (La.1983); State v. Chopin, 372 So.2d 1222, 1224 (La. 1979).
In an effort to discourage police misconduct in violation of these standards, evidence recovered as a result of an unconstitutional search or seizure has been held inadmissible. Thus, evidence abandoned by a citizen and recovered by the police as a direct result of an unconstitutional seizure may not be used in a resulting prosecution against the citizen. Chopin, 372 So.2d at 1224. If, however, a citizen abandons or otherwise disposes of property prior to any unlawful intrusion into the citizen's right to be free from governmental interference, then such property may be lawfully seized and used against the citizen in a resulting prosecution. In this latter case, there is no expectation of privacy and thus no violation of a person's custodial rights. Chopin, Id.; State v. Ryan, 358 So.2d 1274, 1275 (La.1978).
The foregoing standards of police conduct and rules of inadmissibility of unlawfully seized evidence are intended to protect individuals from unwarranted, "forcible" governmental interference. State v. Neyrey, 383 So.2d 1222, 1224 (La.1979). These protections are not implicated, therefore, when an individual encountered by a law enforcement officer remains free to disregard the encounter and walk away. State v. Belton, 441 So.2d 1195, 1199 (La.1983); State v. Lanter, 391 So.2d 1152, 1154 (La.1980); Neyrey, supra, 383 So.2d at 1224; State v. Shy 373 So.2d 145, 147-48 (La.1979).[4] Thus, "[i]t is only when the citizen is actually stopped *711 without reasonable cause or when a stop without reasonable cause is imminent that the `right to be left alone' is violated, thereby rendering unlawful any resultant seizure of abandoned property." Belton, 441 So.2d at 1199 (emphasis added). See also, Andrishok, 434 So.2d at 391; Chopin, 372 So.2d at 1224.
It is against this backdrop that we assess the effect, if any, of the United States Supreme Court's recent decision in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In Hodari D. the Court held an individual is not "seized" within the meaning of the Fourth Amendment until that individual either submits to the police show of authority or is physically contacted by the police. Implicit in the Hodari D. Court's break from its prior jurisprudence in announcing this new standard is the Court's recognition of the severe problem with drug-related criminal conduct in America today. We too recognize the existence of this problem in our State. It is with this problem in mind that we address the balance of interests embodied in the rights against "unreasonable" searches and seizures protected by our constitution.
When balancing the competing interests in determining the limits of the rights against unreasonable searches and seizures, the court must ensure that the constitutional protections afforded to all do not suffer as a result of the abuse of these rights by the few. The balance must nonetheless consider the very essence of a constitution; that is, its ability to live within the framework of everchanging societal needs. Like the Hodari D. Court, we do not believe the constitutional protections against unreasonable searches and seizures were intended to shield the criminal activities of those involved with use and distribution of illicit drugs; specifically, the typical situation which we frequently see in which drugs are "thrown down" in an attempt to evade police detection. As this court stated in Ryan, supra, "the defendant could not expect to carry contraband and drop it with impunity when he sees an approaching officer." Ryan, 358 So.2d at 1276. Thus, cognizant of the drug-related criminal problem in our State, we must today determine first whether our constitution would allow us to adopt Hodari D. as the sole criterion for determining when a seizure has occurred and, if not, how our state's constitutional principles should be interpreted in light of current societal conditions.
Like the Fourth Amendment, La. Const. Art. 1, Sect. 5 also protects individuals from unreasonable searches and seizures. While this court has recognized some of the protections provided by our constitution are greater than those provided by the Fourth Amendment,[5] we have nevertheless invariably followed the United States Supreme Court's precedent regarding the moment when a seizure has occurred for purposes of La. Const. Art. 1, Sect. 5.[6] Because of the *712 greater protections of La. Const. Art. 1, Sect. 5, however, we are precluded from continuing to look solely to the United States Supreme Court precedent in this area as Hodari D. simply offers less protection to our citizens than our constitution would allow. Thus, while we are able to adopt Hodari D. as one of the determinative standards for when a seizure has occurred in this state, see discussion infra, we must also strike out and determine the limits of the additional protections provided by La. Const. Art. 1, Sect 5.
In Belton we found an individual is "seized" within the meaning of La. Const. Art. 1, Sect. 5 when the individual is either "actually stopped" or when an "actual stop" of the individual is "imminent." We believe this two-pronged inquiry reflects the aforementioned additional protections of our constitution. That is, while the Fourth Amendment only protects individuals from "actual stops" by law enforcement officers, Hodari D., our constitution also protects individuals from "imminent actual stops." Therefore, it becomes incumbent upon us to now determine what constitutes an "actual stop" and an "imminent actual stop" as those terms were used in Belton.
After careful consideration of the Hodari D. decision, we conclude it correctly identifies when, during a police encounter, an individual has been "actually stopped." We agree with the United States Supreme Court, an "actual stop" of an individual has not occurred when a police officer yells "Halt!" at a fleeing form which continues to flee. Thus, we hold that an individual has not been "actually stopped" unless he submits to a police show of authority or he is physically contacted by the police. Accordingly, we adopt Hodari D. insofar as it defines when an "actual stop" of a citizen, a seizure under La. Const. Art. 1, Sect. 5, has occurred.
Giving full weight to the additional protections of La. Const. Art. 1, Sect. 5, we must now determine what constitutes an "imminent actual stop." This inquiry is necessary for those situations wherein the police attempt to seize an individual but the individual neither submits to the police show of authority nor is physically contacted by the police. Under these circumstances, despite the absence of an "actual stop" as defined above, our constitution might still mandate a finding that the individual had been seized if an "actual stop" of the individual was "imminent."
In determining whether an "actual stop" of an individual is "imminent," we find that the focus must be on the degree of certainty that the individual will be "actually stopped" as a result of the police encounter. This degree of certainty may be ascertained by examining the extent of police force employed in attempting the stop. It is only when the police come upon an individual with such force that, regardless of the individual's attempts to flee or elude the encounter, an actual stop of the individual is virtually certain, that an "actual stop" of the individual is "imminent."[7] Although non-exhaustive, the following factors may be useful in assessing the extent of police force employed and determining whether that force was virtually certain to result in an "actual stop" of the individual: (1) the proximity of the police in relation to the defendant at the outset of the *713 encounter;[8] (2) whether the individual has been surrounded by the police;[9] (3) whether the police approached the individual with their weapons drawn; (4) whether the police and/or the individual are on foot or in motorized vehicles during the encounter; (5) the location and characteristics of the area where the encounter takes place; and (6) the number of police officers involved in the encounter.
In summary, we have previously held that a seizure violative of La. Const. Art. 1, Sect. 5 occurs when the police, without reasonable suspicion, either actually stop an individual or create a situation wherein an actual stop of the individual is imminent. Today we adopt Hodari D.'s definition for determining when an "actual stop" has occurred. We additionally adopt a standard for determining the "imminency" of an actual stop which focuses on whether an "actual stop" is "virtually certain" to result from the police encounter. To the extent this decision conflicts with our prior decisions, they are hereby overruled.

APPLICATION OF THE LAW TO THE FACTS
In the instant case, the testimony from the motion to suppress hearing and from Tucker's trial on the merits reveals that two police officers approached Roby's Arcade in their car, stopping several feet away from where Tucker was standing on a street corner, possibly separated from Tucker by an unrelated parked car.[10] As Tucker saw the police unit approaching, he quickly turned and began to leave the scene. At this point, one of the officers sprang from the car and ordered Tucker to halt and prone out. Rather than submit to this show of police authority, Tucker continued freely in his movements, discarding a bag containing contraband. Thereafter, Tucker submitted to the police show of authority and lay down. Under these facts, it is clear Tucker had not been "actually stopped" at the time he discarded the evidence. Thus, the determinative question becomes whether an actual stop of Tucker was "imminent" before Tucker abandoned the marijuana cigarettes.
Applying the previously listed factors to the instant case, the testimony reveals that the police were several feet away from Tucker at the outset of the encounter, and were possibly separated from direct access to him by a parked car obstructing their path. Thus, because Tucker had a lead of several feet between himself and the officers and was traveling towards the rear of the arcade, his being "actually stopped" was far from "virtually certain" to occur. Furthermore, the incident took place at night and in a commercial area within the City of Shreveport. Hence, Tucker's flight was camouflaged by the darkness of the night, and the urban area provided numerous locations where Tucker could conceal himself. There is no testimony that any weapons were drawn at this or any other point during the encounter. Although the testimony indicates there were several other officers in and around Roby's Arcade, it does not appear Tucker had been surrounded by the police. Moreover, the number of police officers in and around Roby's did not substantially increase the certainty that Tucker would be actually stopped, as these additional officers were focusing their attention on other individuals in the general area.
Based on these facts, we cannot conclude an actual stop of Tucker was "virtually certain" to occur at the time he abandoned the evidence. Thus, at the time Tucker abandoned the marijuana he had not been unconstitutionally seized. For this reason, the court of appeal erred in reversing the trial court's denial of Tucker's motion to suppress the marijuana. Accordingly, the decision of the court of appeal on count two is reversed. The trial court's conviction of Tucker on this count is reinstated.
We next address the issues presented by Tucker's pro se application. This application raises only a single assignment of *714 error, namely that the evidence produced at trial did not establish his guilt on count one (possession of marijuana with intent to distribute arising from the February 28 incident) beyond a reasonable doubt. Contrary to Tucker's assertions, unrebutted testimony established that Tucker was carrying 26 marijuana cigarettes, and competent expert testimony established that this amount of marijuana and the form in which it was being carried were more consistent with distribution than personal use. Viewing the evidence in the light most favorable to the prosecution, the court of appeal found that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. State v. Nealy, 450 So.2d 634 (La.1984). We agree with this conclusion of the court of appeal and, for the reasons assigned by it, 604 So.2d at 609-611, this assignment of error lacks merit. Accordingly, we affirm Tucker's conviction on count one.
JUDGMENT OF THE COURT OF APPEAL AFFIRMED AS TO COUNT ONE; JUDGMENT OF THE COURT OF APPEAL REVERSED AND CONVICTION AND SENTENCE REINSTATED AS TO COUNT TWO.
MARCUS, J., concurs and assigns reasons.
CALOGERO, C.J., dissents and assigns reasons.
DENNIS, J., dissents with reasons.
ORTIQUE, J., dissents with reasons.
MARCUS, Justice (concurring).
As the majority notes, this court has "invariably" followed the United States Supreme Court's precedents regarding seizures. I would continue to do so in the present case and would follow the Court's decision in Hodari D. Accordingly, I respectfully concur in the result.
ORTIQUE, Justice, dissenting.
I respectfully dissent from the majority opinion. I am convinced that the latest pronouncement in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) does not meet the requirements of La. Const. Art. I, Sect. 5.
I agree with the appellate court that the defendant, Tucker, discarded the bag containing the marijuana cigarettes after he was unlawfully seized and therefore the court of appeal was correct in finding the seizure violative of our La. Const. Art. I, Sect. 5, and hence was inadmissible.
CALOGERO, Chief Justice, dissenting.
The majority today incorrectly adopts the U.S. Supreme Court's standard for determining when a citizen has been seized by police, inexplicably creates a wholly new standard for determining when such a seizure is virtually certain, and then misapplies both standards to the facts at hand. I therefore respectfully dissent.
Before today's decision, this Court had consistently held that a suspect is seized whenever there has been a display of police authority which would lead a reasonable person to believe that he is about to be detained, whether or not he has submitted to that display of authority. State v. Belton, 441 So.2d 1195, 1198-99 (La.1983) (citing United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); State v. Chopin, 372 So.2d 1222 (La.1979) (police indicated that "official detention" sufficient to implicate suspect's constitutional "right to be free from governmental interference" was imminent when they swung their car into suspect's path and stopped it just a few feet away); State v. Saia, 302 So.2d 869, 873 (La.1974) (police effected a seizure when they "sprang from their car and overtook the defendant"). Cf. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (seizure occurs when a reasonable person would not feel free to leave under the circumstances). If a reasonable person would not believe himself to be "free to disregard the encounter and walk away," he was seized. State v. Belton, supra, at 1199.
First, the majority today "adopt[s] Hodari D. insofar as it defines when ... a seizure under La. Const. art. 1 sec. 5, has occurred." Op. at 712. By adopting what is itself a *715 newly restrictive interpretation of the protections afforded to citizens under the Fourth Amendment, the majority lessens the protections afforded to citizens under La. Const. art. 1 sec. 5 and the earlier jurisprudence interpreting it. In doing so, the majority ignores the fact that art. 1 sec. 5 of the Louisiana constitution does not merely duplicate the Fourth Amendment but is in fact "one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." State v. Hernandez, 410 So.2d 1381, 1385 (La.1982); see also State v. Church, 538 So.2d 993 (La.1989) (roadblock which may meet federal constitutional standards nonetheless unconstitutional under La. Const. art. 1 sec. 5); State v. Kinnemann, 337 So.2d 441, 443-44 (La.1976) (La. Const. art. 1 sec. 5 protects citizens even in situations where the Fourth Amendment may not apply). Although we "give careful consideration to the United States Supreme Court interpretation of relevant provisions of the federal constitution, ... we cannot and should not allow those decisions to replace our independent judgment in construing the Constitution adopted by the people of Louisiana." State v. Hernandez, supra, at 1385 (La.1982). To allow the U.S. Supreme Court's interpretation of the Fourth Amendment to dictate this Court's interpretation of La. Const. art. 1 sec. 5 "results in nothing less than a subversion of the will of the people of the State of Louisiana as expressed in their constitution and amounts to a judicial undermining of the rights that the people in their constitution declared shall be `inalienable by the state and shall be preserved inviolate by the state.' La. Const. 1974 Art 1 § 1." State v. Reeves, 427 So.2d 403, 421 (1982) (Dennis, J., dissenting).
Second, the majority's contention that it has given "full weight to the additional protections" of the Louisiana Constitution is unconvincing. Although the majority creates a new standard for determining what constitutes an imminent seizure which purports to "balance[] the competing interests in determining the limits of the rights against unreasonable searches and seizures." Op. at 711, the standard is no more than a chimera unlikely to deter police misconduct. Nothing in the La. Const. art. 1 sec. 5 or our previous jurisprudence suggests that a citizen is not seized unless, as the majority rules today, the police apply such force that it is "virtually certain" that an "actual stop" will occur. The majority relies heavily on but misapplies our holding in State v. Belton, supra. The test we set out in Belton was whether or not a reasonable person would believe himself to be "free to disregard the encounter and walk away." If he would not, he was seized. State v. Belton, supra, at 1199. The majority's focus on police force, actual stops, and virtual certainty distorts our constitution and jurisprudence.
Finally, the record reveals that even if we were to accept that Hodari D. governs when a suspect is seized by police, and that the additional protections afforded by La. Const. art. 1 sec. 5 apply only when a seizure of the individual is virtually certain or imminent, the facts at hand would lead us to a different result in this case. Tucker and his companion were approached by a large number of marked police units participating in a drug sweep code named "Operation Thor." Operation Thor depended not on isolated patrols but rather on saturation sweeps involving large numbers of law-enforcement personnel massed in targeted areas. On the night of Tucker's arrest, the Shreveport Police Department had sent ten marked police cruisers and 20 to 30 officers to Roby's Arcade to conduct a sweep. The police approached Tucker and a companion; as the two men observed the police units approach, they turned and walked away. The police then ordered them to halt and lie prone. Tucker moved several steps and tossed away the illegal drugs. He then obeyed the police command and lay down. If we apply the factors set out by the majority we find that (1) the police were quite close to the defendantclose enough to speak to himat the outset of the encounter; (2) the individual was, if not in the geometric center of a group of police then at least nearly surrounded by blue uniforms; (3) though the testimony does not indicate with certainty that the police had weapons drawn, they approached and exited their cars while commanding Tucker to *716 "halt" and "prone out;" (4) the police arrived with the overwhelming superior force of 10 marked vehicles while Tucker stood exposed; (5) though the location and characteristics of the area where the encounter took place may have made it suspect in the eyes of the police, innocent activity is not made suspicious merely because it takes place in a suspect area (State v. Belton, supra); and finally (6) the police were at Roby's Arcade en masse with some 20 or 30 officers. It is hard to imagine a situation in which the seizure of a suspect could be any closer to virtually certain. Thus, even applying the standards the majority erroneously interjects into Louisiana law, Tucker was seized, without reasonable suspicion, as the police came upon him.
The drugs seized should have been suppressed. I therefore respectfully dissent.
DENNIS, Justice, dissenting.
I join in the dissenting opinion of Chief Justice Calogero and write separately to give additional reasons.
The court's narrow constructions of the words "seizures" and "invasions of privacy" in Article I, § 5 of our state constitution and of the words "stop a person" in La.Code Cr.Proc. art. 215.1 are derelictions of this court's duty to support the constitution and laws of this state. In particular, the majority now adopts definitions of those words that are unfaithful to the text of the constitution and the statute, the drafting history of both, the United States Supreme Court decisions upon which they were based, and the prior cases of this court construing those provisions over the past two decades.
Beginning in 1967, the United States Supreme Court rejected the narrow view that a person's right to be secure in his person and property from unreasonable searches, seizures and invasions of privacy protects a person only against actual physical seizures of his body or his property. In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court considered whether electronic surveillance conducted "without any trespass and without the seizure of any material object fell outside the ambit of the Constitution." Id. at 353, 88 S.Ct. at 512. The Court rejected that "narrow view" of the Fourth Amendment and held that electronic eavesdropping is a "search and seizure" within the meaning of the Fourth Amendment, Id. at 353-54, 88 S.Ct. at 512; and that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, even when without any technical trespass under local property law. See California v. Hodari, 499 U.S. 621, 632-36, 111 S.Ct. 1547, 1554-56, 113 L.Ed.2d 690 (1991) (Stevens, J., dissenting).
This comprehensive interpretation of the word "seizure" in Katz provided the basis for the Court's holding in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the following year. In Terry, the Court necessarily concluded that the word "seizure" in the Fourth Amendment encompasses official restraints on individual freedom that fall short of a common law arrest. Thus, Terry broadened the range of encounters between the police and the citizen encompassed within the term "seizure," while at the same time, lowering the standard of proof necessary to justify a "stop" in the newly expanded category of seizures covered by the Fourth Amendment: "It is quite plain that the Fourth Amendment governs `seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person." Id. at 16, 88 S.Ct. at 1877 (footnote omitted). "We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a `technical arrest' or a `full-blown search.'" Id. at 19. "Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Id. at 20, n. 16, 88 S.Ct. at 1879, n. 16.
In 1968 our legislature adopted a "stop-and-frisk" statute embodying the general *717 words and ideas of Terry v. Ohio. The Louisiana statute is almost identical to the New York "stop-and-frisk" law discussed by the Court in the Terry companion case, Sibron v. New York, 392 U.S. 40, 43-44, 88 S.Ct. 1889, 1892-93, 20 L.Ed.2d 917 (1968). The Court made no pronouncement on the facial constitutionality of the New York law, Id. at 61, 88 S.Ct. at 1902, because, as Justice Harlan observed, the statute sets forth "an adequate general formula * * * but any particular stop must meet the Terry standard as well." Id. at 72-73, 88 S.Ct. at 1907. The entirety of La.Code Cr.Proc. art. 215.1 confirms that the legislature intended to adopt the rules of Terry, including its definition of a "seizure" or a "stop". Paragraph A, which is most pertinent here, provided:
A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.
La.Code Cr.Proc. art. 215.1(A) (Added by 1968 La.Acts No. 305). The legislature has maintained this provision without change through subsequent sessions and amendments, clearly indicating its intention to preserve the concepts and rules of Terry v. Ohio as originally expressed by the Supreme Court. See 1982 La.Acts No. 686; 1983 La. Acts No. 32, 1st Ex.Sess.
In 1974 our new state constitution based its broad right to privacy guarantee directly upon the concepts of "searches", "seizures" and "privacy" expressed in Katz, Terry and other United States Supreme Court decisions of that era. Article I § 5 provided:
Every person shall be secure in his person, property, communications, houses, papers and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
Until today, this court consistently has interpreted and applied Article I § 5 of our state constitution to protect citizens from governmental invasions of their reasonable expectations of privacy, i.e., their right to be let alone, through electronic or any other non-physical searches and seizures. For example, in State v. Reeves, 427 So.2d 403, 410 (1982) (Blanche, J., on rehearing), this court unanimously agreed that Article I § 5 of our state constitution protects persons from nonconsensual electronic monitoring by the state or federal government as fully as does the Fourth Amendment as interpreted and applied in Katz v. United States, supra. The only disagreement between the justices in Reeves was over whether Article I § 5's explicit protection of a person's "communications" from "unreasonable searches, seizures or invasions of privacy" requires an officer to obtain a warrant from a magistrate, based on probable cause, before intercepting a person's private conversations by "consensual" electronic monitoring. In other words, in Reeves, this court wholly endorsed the principle that under Article I § 5 of our state constitution a person suffers an unconstitutional "search", "seizure" or "invasion of privacy" whenever the state invades his reasonable expectation of privacy, regardless of whether his person or property physically has been seized or interfered with.
By the same token, until today, every justice of this court was of the opinion that Louisiana, by virtue of Article I § 5 of the constitution and La.Code Cr.Proc. art. 215.1, had adopted fully the principles and concepts of Terry v. Ohio. Accordingly, this court has held repeatedly during the past two decades that an officer must have reasonable suspicion of criminality before he may accost a person and by show of authority restrain his freedom to walk away. Furthermore, this court decided consistently that such a confrontation on the street between the citizen and the policeman in the absence of suspicious circumstances amounts to a violation of the citizen's right to privacy and requires the exclusion of any evidence derived from the unreasonable seizure, invasion of privacy or *718 stop. See, e.g., State v. Sims, 426 So.2d 148 (La.1983) (Blanche, J., writing for the majority including Dixon, C.J., Marcus, J., Dennis, J., Watson, J., and Lemmon, J., and to which Calogero, J., concurred) ("A person is `seized' within the meaning of the Fourth Amendment and La. Const. art. I, § 5 only when the law enforcement official, by means of physical force or show of authority, has in some way restrained the liberty of the citizen.") (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Andrishok, 434 So.2d 389, 391 (La.1983) (Marcus, J., writing for the majority including Dixon, C.J., Calogero, J., Dennis, J., Watson, J., and Lemmon, J.) ("Where officers do not have the right to make an investigatory stop, property abandoned or otherwise disposed of as a result thereof cannot be legally seized."); State v. Belton, 441 So.2d 1195, 1199 (La. 1983) (Marcus, J., writing for the majority including Blanche, J., Watson, J., and Lemmon, J., and to which Dennis, J., concurred.) ("When police officers make an investigatory stop without the legal right to do so, property abandoned or otherwise disposed of as a result thereof cannot be legally seized."); State v. Williams, 421 So.2d 874, 876 (La. 1982) (Calogero, J., writing for the majority including Blanche, J., Marcus, J., Dennis, J., and Lemmon, J., and to which Watson, J., dissented for factual reasons) (The police may not "approach citizens `under circumstances that make it seem that some form of detention is imminent unless they have ... reasonable grounds to detain the individual.' ") (quoting State v. Duplessis, 391 So.2d 1116, 1117 (La.1980) (Dixon, J., writing for the majority including Calogero, J., Blanche, J., Watson, J., Lemmon, J., and to which Marcus, J., concurred.); State v. Chopin, 372 So.2d 1222, 1224-25 (La.1979) (Marcus, J., writing for the majority including Dixon, J., Calogero, J., Blanche, J., Watson, J., and to which Dennis, J., concurred.) (Officers "effected an intrusion upon defendant's right to be free from governmental interference when they swung the patrol car around into [defendant's] path ... Such an approach clearly indicated that some form of official detention was imminent."); State v. Ryan, 358 So.2d 1274, 1276 (La.1978) (Dixon, J., writing for the majority including Sanders, C.J., Summers, J., Tate, J., Marcus, J., Calogero, J., and Dennis, J.) ("`The police cannot approach a citizen under circumstances that make it seem that some form of detention is imminent unless they have probably cause to arrest or reasonable ground to detain the individual under Terry v. Ohio.'") (quoting State v. Saia, infra at 873) (Dixon, J., writing for the majority including Tate, J., Calogero, J., and Barham, J.); State v. Church, 538 So.2d 993, 997 (La.1989) (Watson, J., writing for the majority including Dixon, C.J., Calogero, J., and Dennis, J.) ("It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.") (quoting Boyd v. United States, 116 U.S. 616 at 635, 6 S.Ct. 524 at 535, 29 L.Ed. 746 (1886)). See also State v. Wilson, 388 So.2d 744 (La.1980); State v. Mathews, 366 So.2d 1348 (La.1978); State v. Smith, 347 So.2d 1127 (La.1977); State v. Cook, 332 So.2d 760 (La.1976); State v. Kinneman, 337 So.2d 441 (La.1976); State v. Saia, 302 So.2d 869 (La.1974).
As the court of appeal concluded in this case, State v. Tucker, 604 So.2d 600, 606-609 (2d Cir.1992), under a faithful application of our settled state constitutional and legislated law, the officers' show of force and authoritytaking the form of orders by armed, uniformed officers to "halt" and "prone out"adequately conveyed the message that the defendant Tucker was not free to leave. Because the officers acted without reasonable suspicion of completed, current or intended criminal conduct by Tucker, the appellate court correctly held that this constituted an unlawful stop and required the exclusion of evidence derived as a fruit thereof under established principles of law.
Today, however, my colleagues suddenly depart from the well settled meaning of the words "seizures", "invasions of privacy", and "stop" in Article I § 5 and Article 215.1. Instead, they substitute their own pleasure for that of the drafters, ratifiers and legislators. Conceding that they are engaged in creative lawmaking, they treat Article I § 5 of our state constitution as if it were a clean slate, having no meaningful text, history or *719 jurisprudential interpretation. Indeed, except for an egregiously incorrect footnote suggesting that Article I § 5 has never been involved crucially in our prior stop-and-frisk cases, the majority does not deign to discuss, much less derive instruction from, the substantial body of this court's previous decisions. As for Louisiana's twenty-five year old stop-and-frisk law, La.C.Cr.P. Art. 215.1, it is treated virtually as a dead letter, meriting no discussion and one nonchalant citation in the majority opinion.
To be sure, the majority pays lipservice to a constitutional right of privacy supposedly more protective than that recognized by Hodari. But the outcome of this case itself vividly illustrates that the majority's cumbersome system of "actual stop", "imminent actual stop", "extent of police force" and "virtual certainty" tests, in practice, quickly collapses into nothing more than the common law theory of arrest adopted in Hodari. As Chief Justice Calogero's dissenting opinion cogently demonstrates, if the "stop" or "seizure" of defendant Tucker was not "imminent" when the officers of Operation Thor Drug Sweep arrived at Roby's Arcade, alighted in uniform and armed from their marked police car, and shouted "halt" and "prone out", very few, if any, street encounters will be held to be "imminent actual stops". In any event, the majority's multiple part test is far too convoluted and confusing to be of practicable guidance to police officers in the field and is therefore bound to receive further reductive interpretation.
The majority offers no explanation of how this court can hold for over two decades that Article I, Sec. 5 of the state constitution and La.C.Cr.P. Art. 215.1 afford as much protection against unjustified "stops," "seizures" and "invasions of privacy" as the Fourth Amendment according to the Katz and Terry Courts, but that, in 1993, suddenly, they protect against nothing more than Justice Scalia's new definition of the term "seizure." Clearly, the activity that my colleagues have engaged in does not deserve to be called "judging," "interpretation" or a principled application of law. It is obvious that they have distorted the words of Article I, Sec. 5 and Article 215.1 in order to "keep the constitution up to date" or "to bring it into harmony with the times" or to enable it "to live within the framework of ever-changing societal needs." However, it was never intended that this court should have such power, "which in effect would make us a continuously functioning constitutional convention." Katz v. United States, supra at 373, 88 S.Ct. at 523 (Black, J., dissenting).
In reality, my colleagues have sunk this court to the lowest pitch of abject followership. They no longer believe in our state constitution as an act of fundamental self-government by the people of Louisiana. They no longer perceive this court to be the final arbiter of the meaning of that constitution, bound by the intent of the drafters and ratifiers as reflected by the text, the drafting history, and this court's constitutional precedents. Instead, for them, our state constitution is a blank parchment fit only as a copybook in which to record the lessons on the history of the Common Law that flow from Justice Scalia's pen.
Even if we were free to update the constitution according to our own perception of prudent public policy, the course of action chosen by the majority is subject to criticism. First, the majority's policy will encourage the very evils of racial discrimination against which the drafters and ratifiers of our constitution intended to provide bulwarks. There is little question but that the majority's decision will invite the use of police power to accost innocent persons on the streets of "high crime" areas without reasonable suspicion of criminality. The majority opinion, for all practical purposes, places the imprimatur of this court on stops and frisks without reasonable suspicion of criminality in "high crime areas" throughout the state. Because "high crime" areas usually are located in minority neighborhoods, can there be any doubt that racial minorities will bear the brunt of the official intimidation of innocent pedestrians that for all practical purposes is sanctioned by the majority opinion? Second, it may be questioned whether the majority's modification of our constitutional and statutory law will contribute appreciably toward eliminating the trafficking of illegal drugs in our society. It has not been shown that it's necessary to effective law enforcement that officers be authorized to accost persons in *720 street encounters without reasonable suspicion of criminality. Evidently, there has been no effective attempt by the legislature to amend either Article I § 5 or La.Code Cr.Proc. art. 215.1 to modify the requirement of reasonable suspicion or the definition of a stop for purposes of investigatory confrontations, and this court is ill equipped to make the type of legislative factual findings necessary to competently assess the wisdom of such a change in policy. On the other hand, it is possible that the fallout of increased racial divisiveness, ethnic fear and uncooperativeness that is apt to result from the majority's rule encouraging stops without reasonable suspicion may hamper any effort to combat the drug-related criminal problem through a holistic program including prevention, treatment and education as well as law enforcement.
My greatest disappointment in the majority opinion, however, is in its cavalier disrespect for our constitutional and legislated laws and the unanimous opinions of the justices of this court interpreting and applying Article 215.1 for a quarter century and Art. I, Sec. 5 for almost two decades. There can be no doubt, as this court has held until today, that the makers of our constitution and our laws sought to protect our citizens on their streets and in their public places from being accosted by government officers except under reasonable suspicion of wrongdoing. "They conferred, as against the Government, the right to be let alonethe most comprehensive of rights and the right most valued by civilized men." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). To protect that right, every unjustifiable intrusion by the state upon the privacy of the individual, whatever the means employed, must be deemed a violation of our constitution or the statute or both. Today's opinion of this court has lost sight of these fundamental principles.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, LEMMON, J., was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] 609 So.2d 212 (La.1992).
[2] 609 So.2d 212 (La.1992).
[3] State v. Tucker, 604 So.2d 600 (La.App. 2nd Cir.1992).
[4] See also, State v. Sims, 426 So.2d 148, 152 (La.1983) ("A person is `seized' within the meaning of the Fourth Amendment and La. Const. art. 1, § 5 only when the law enforcement official, by means of physical force or show of authority, has in some way restrained the liberty of the citizen.")
[5] The greater protections of the Louisiana Constitution stem from the broader language which it employs. Compare La. Const. Art. 1, Sect. 5:

Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
with U.S. Const.Amend. IV:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[6] Although State v. Church, 538 So.2d 993 (La. 1989) did deviate from the federal Fourth Amendment jurisprudence, that divergence was not based upon the moment of seizure. See Church, 538 So.2d at 995, relying on the Fourth Amendment to determine the moment of seizure in a roadblock case. Rather, Church rested on a requirement of reasonable suspicion at the point of a roadblock seizure, a requirement not necessary under the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

The vast majority of the Louisiana search and seizure cases summarily apply the Fourth Amendment and its jurisprudence to determine when a seizure has occurred under the Louisiana Constitution. This seems to reflect that this court may have felt the provisions of the Louisiana Constitution had not yet been implicated. Thus, those cases do not necessarily represent the boundaries of Art. 1, Sect. 5, but rather may merely suggest we were constrained by the Federal Constitution. Now that the United States Supreme Court has, in Hodari D., constricted the range of circumstances under which a Fourth Amendment seizure will be found to have occurred, we are no longer restricted by prior Fourth Amendment jurisprudence and now have room to interpret the bounds of our own constitution.
[7] Compare, State v. Zielman, 384 So.2d 359 (La. 1980) (defendants' vehicle was suddenly surrounded by marked patrol cars with their lights flashingactual stop imminent and, therefore, defendants had been seized) and Chopin, supra (police swung their car around into defendant's path and stopped within three or four feet of defendantactual stop imminent and, therefore, defendants had been seized) with State v. Duplessis, 391 So.2d 1116 (La.1980) (police parked their car ten feet away from where defendant was standing and approached him on footactual stop not imminent and, therefore, defendant was not seized) and Ryan, supra (police officer sprang from police car and approached defendant who was suspiciously concealing object in one handactual stop not imminent and, therefore, defendant was not seized).
[8] See, e.g., Duplessis, supra n. 7.
[9] See, e.g., Zielman, supra n. 7.
[10] The testimony is conflicting regarding whether this unrelated car was parked between Tucker and the police cruiser or was only alongside the cruiser.