PATRICIA RIVET MURRAY, Judge.
 

 Lin this criminal appeal, the defendant, Tedrick Williams, appeals his conviction and sentence for possession of cocaine. The only issue presented is whether the district court erred in denying Mr. Williams’ motion to suppress the evidence. Answering that question in the affirmative, we reverse and remand.
 

 STATEMENT OF THE CASE
 

 On February 11, 2010, the State charged Mr. Williams with possession of cocaine. In the same bill of information, the State charged Mr. Williams’ brother, Fredrick Williams, with being a convicted felon in possession of a firearm. They both pled not guilty at their arraignments. On April 23, 2010, the district court heard and denied their motion to suppress the evidence. This court, with one judge dissenting, denied Mr. Williams’ application for emergency supervisory writ.
 
 State v. Williams,
 
 10-0881 (La.App. 4 Cir.
 
 6/21/10)(unpub.).
 

 [1]
 

 The Louisiana Supreme Court also denied his writ application.
 
 State v. Williams,
 
 10-1537 (La.7/7/10), 39 So.3d 588.
 

 hOn July 13, 2010, Mr. Williams withdrew his not guilty plea and pled guilty as charged, reserving his right to appeal the court’s denial of his motion to suppress the evidence under
 
 State v. Crosby,
 
 338 So.2d 584 (La.1976).
 
 [2]
 
 After Mr. Williams’ waived all delays, the district court sentenced him to five years at hard labor with
 
 *1211
 
 three years of the sentence suspended. This appeal followed.
 

 STATEMENT OF THE FACTS
 

 Because Mr. Williams pled guilty reserving his right to appeal the district court’s denial of his motion to suppress, the facts are taken exclusively from the motion hearing. At the hearing, Detective Jonathan Rivet and Officer Wesley Humbles, the officers who arrested Mr. Williams and his brother on the night of November 24, 2009, were the sole witnesses.
 

 Detective Rivet testified that on the night of the arrests he and three other officers — Officer Humbles, Detective Quincy Jones, and Officer Glen Washington— were on proactive foot patrol. The area they were patrolling was an apartment complex, the Audubon Pointe Apartments, located on Maple Leaf Drive in Algiers. The complex had been the scene of several incidents of burglary and drug activity.
 

 On the night of the arrests, the officers entered the complex through a back gate. The officers questioned all the persons that the officers met regarding their reason for being at the complex and ran their names in the police computer. While the officers were walking through the complex at about 6:00 p.m. that night (which was almost dark due to the time of year), they spotted Mr. Williams and his brother | ^standing on the sidewalk. According to Detective Rivet, he and Officer Humbles began approaching the brothers simply to question them — to ask them their names, if they lived in the complex, and why they were there that evening. Although Detective Rivet was dressed in plain-clothes, Officer Humbles was dressed in a police uniform. When the brothers saw the officers approaching, they put their hands in their pockets and began walking away. The officers continued approaching the brothers and ordered them to stop. The officers also ordered the brothers to remove their hands from their pockets because of safety concerns.
 

 Detective Rivet focused his attention on Fredrick Williams, and Officer Humbles focused on Tedrick Williams. Despite the officers repeated commands to do so, Fredrick Williams refused to remove his hands from his pockets. After Detective Rivet shone his flashlight on Frederick Williams and drew his gun on him, Fredrick Williams removed his hands from his pockets. Detective Rivet then frisked him, found a gun in his jacket pocket, and arrested him for carrying a concealed weapon.
 

 On cross-examination, Detective Rivet admitted the following facts: that the officers did not arrest anyone at the complex that evening besides Mr. Williams and his brother; that the brothers were just talking and standing on the sidewalk by the street in front of the complex when the officers first saw them; that it was fairly cold outside that November evening; that the brothers eventually complied with the officers’ orders to stop; that the officers had received no tips of criminal activity by either brother; that the officers were not acting on any tip of any particular criminal activity at the complex; and that because he was focused on Mr. Williams’ brother he was unsure exactly what actions Mr. Williams had taken. Detective Rivet insisted that he and Officer Humbles intended only to conduct a field interview. 14Petective Rivet further insisted that he became suspicious of the brothers because they put their hands in their pockets and began walking away when the officers approached them. Because the brothers had their hands in their pockets, Detective Rivet believed that they were hiding something, had just committed a crime, or were about to commit a crime.
 

 Officer Humbles, who arrested Mr. Williams, was the other witness at the
 
 *1212
 
 motion hearing. He characterized the apartment complex where the arrest occurred as a high drug crime area where officers had made many arrests and had executed many search warrants. The complex had a history of people firing guns in it and had experienced an increase in auto and residential burglaries. According to Officer Humbles, the complex had “no trespassing” signs posted. For these reasons, the officers routinely patrolled the complex, asking all the persons the officers passed their names, whether they lived there, and their reasons for being there. The officers patrolled the complex on foot because they were too easily spotted if they patrolled in a vehicle.
 

 On the night of Mr. Williams’ arrest, Officer Humbles and the other officers were conducting a proactive foot patrol through the complex. Officer Humbles testified that as he and Detective Rivet were walking through the complex they noticed the brothers standing across the street from where the officers were walking. Officer Humbles testified that he became suspicious of the brothers because they put their hands in their pockets as the officers approached. In his subsequent testimony, Officer Humbles qualified that statement and testified that when the brothers saw the officers approaching, “I’m not sure about Mr. Fredrick but I remember Mr. Tedriek having both hands in his pockets.” Thus, according to Officer Humbles, Mr. Williams had his hands in his pockets before he saw the ^officers approaching; and Mr. Williams’ brother put his hands in his pockets after he saw the officers approaching.
 

 As noted, Officer Humbles’ attention was focused on Mr. Williams. Although Mr. Williams failed to comply with the officers’ first order to remove his hands from his pockets, he complied with the second order to do so. As Mr. Williams removed his left hand from his jacket pocket, he threw down a small object and put his hands on his head. Because Officer Humbles was shining his flashlight on Mr. Williams, he saw the object fall to the ground. He retrieved the object, which was a plastic bag containing eleven rocks of what appeared to be crack cocaine. He detained Mr. Williams, handcuffed him, and advised him of his
 
 Miranda
 
 rights, which Mr. Williams indicated that he understood. Mr. Williams gave the officers his name, and he denied throwing down the plastic bag. A field test conducted later at the police station revealed that the substance in the bag tested positive for cocaine.
 

 On cross-examination, Officer Humbles testified that the brothers were engaged in a conversation when the officers first spotted them. His attention was drawn to the brothers for two reasons. First, upon seeing the officers approaching, the brothers broke off their conversation and Mr. Williams’ brother (not Mr. Williams) put his hands in his pockets and began walking away toward the breezeway of the complex. Second, the complex was a high drug crime area that was known for armed robberies. Officer Humbles testified that “[Mr. Williams] could be a victim as well. He could be the actual perpetrator. So, we just, like I said, it’s just part of our routine patrol to make [sure that] the people, the residents that live back there, are safe.” Officer Humbles reiterated that the officers intended to stop the brothers simply to question them as to why they were standing outside | fithe complex at that time of night — between 6:00 p.m. and 7:00 p.m. by his estimation.
 

 The area in which the arrests occurred was well lit with streetlights. In addition, when the brothers refused to remove their hands from their pockets, both Detective Rivet and Officer Humbles shone their
 
 *1213
 
 flashlight on the brothers. Officer Humbles testified that he believed he drew his gun on the brothers as he was walking across the street and ordering them to remove their hands from their pockets. He further testified that he “probably” had drawn his gun by the time Mr. Williams abandoned the bag of cocaine and that by that time Detective Rivet also had drawn his gun. Neither Officer Humbles nor Detective Rivet knew the brothers before their arrest that night; however, one of the other officers (Officer Washington) indicated that he was familiar with the brothers.
 

 The State introduced a certified copy of the crime lab report concerning the substance (cocaine) found in the bag that Mr. Williams abandoned.
 

 DISCUSSION
 

 Errors Patent
 

 A review of the record reveals there are none.
 

 Assignment of Error
 

 By his sole assignment of error, Mr. Williams contends that the district court erred by denying his motion to suppress the evidence — the cocaine he abandoned when the officers stopped him and his brother. He maintains that the officers lacked reasonable suspicion to support the stop and that the abandoned cocaine thus was required to be suppressed.
 

 Because the cocaine was seized without a warrant, the State had the burden of showing a lawful basis for the seizure.
 
 See
 
 La. C.Cr.P. art. 703;
 
 State v. Wells,
 
 08-2262 (La.7/6/10), 45 So.3d 577. Generally, a trial court’s ruling regarding the suppression of evidence is afforded great weight and will not be set aside unless there is an abuse of that discretion.
 
 Id.
 
 Although it is well-settled that an appellate court should review a trial court’s rulings under a deferential standard with regard to factual determinations, its legal findings are subject to a
 
 de novo
 
 standard of review.
 
 State v. Hunt,
 
 09-1589 (La.12/1/09), 25 So.3d 746;
 
 State v. Hampton,
 
 98-0331 (La.4/23/99), 750 So.2d 867.
 

 Officers cannot legally seize property abandoned by a defendant if the abandonment occurred pursuant to an infringement on the defendant’s privacy rights. On the other hand, “if ... property is abandoned without any prior unlawful intrusion into a citizen’s right to be free from government interference, then such property may be lawfully seized. In such cases, there is no expectation of privacy and thus no violation of a person’s custodial rights.”
 
 State v. Belton,
 
 441 So.2d 1195, 1199 (La.1983);
 
 see also State v. Britton,
 
 93-1990 (La.1/27/94), 633 So.2d 1208;
 
 State v. Williams,
 
 07-0700 (La.App. 4 Cir. 2/13/08), 977 So.2d 1101;
 
 State v. Handy,
 
 02-1025 (La.App. 4 Cir. 9/25/02), 828 So.2d 1207. “[T]he police do not need probable cause to arrest or reasonable suspicion for an investigatory stop every time they approach a citizen in a public place.”
 
 Britton,
 
 93-1990 at p. 2, 633 So.2d at 1209.
 

 For purposes of determining whether abandoned property may be lawfully seized, “[a]n ‘actual stop’ occurs when an individual submits to a police show of authority or is physically contacted by the police.”
 
 Handy,
 
 02-1025 at p. 4, 828 So.2d at 1210 (citing
 
 State v. Tucker,
 
 626 So.2d 707 (La.1993)). “An ‘imminent actual stop’ occurs when the police come upon an individual with such force that, regardless of the individual’s attempts to flee or elude the encounter, an actual stop |sof the individual is virtually certain.”
 
 Id.
 
 The following factors are to be considered in assessing the extent of police force employed in determining whether the force used by
 
 *1214
 
 officers was “virtually certain” to result in an “actual stop”:
 

 (1) the proximity of the police in relation to the defendant at the outset of the encounter;
 

 (2) whether the individual has been surrounded by the police;
 

 (3) whether the police approached the individual with their weapons drawn;
 

 (4) whether the police and/or the individual are on foot or in motorized vehicles during the encounter;
 

 (5) the location and characteristics of the area where the encounter takes place; and
 

 (6) the number of police officers involved in the encounter.
 

 Handy,
 
 02-1025 at pp. 4-5, 828 So.2d at 1210 (citing
 
 Tucker,
 
 supra).
 

 Not every encounter between a police officer and a citizen is a stop. Encounters between police officers and citizens have been divided into three tiers.
 
 State v. Fisher,
 
 97-1133 (La.9/9/98), 720 So.2d 1179 (citing
 
 United States v. Watson,
 
 953 F.2d 895, 897 n. 1 (5th Cir.1992)). The three tiers are as follows:
 

 In the first tier, there is no seizure or Fourth Amendment concern during mere communication with police officers and citizens where there is no coercion or detention.
 
 State v. Fisher,
 
 97-1133 (La.9/9/98), 720 So.2d 1179, 1183. The second tier consists of brief seizures of a person, under
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), if the officer has an objectively reasonable suspicion, supported by specific and ar-ticulable facts, that the person is, or is about to be, engaged in criminal activity.
 
 Fisher,
 
 720 So.2d at 1183. The third tier is custodial arrest where an officer needs probable cause to believe that the person has committed a crime.
 
 Id.
 

 State v. Hamilton,
 
 09-2205, p. 4 (La.5/11/10), 36 So.3d 209, 212. With respect to the first tier, “[a]s long as the person approached by the officers remains free to ^disregard the encounter and walk away, there are no constitutional implications.”
 
 Id.
 

 In this case, the officers approached Mr. Williams and his brother, who in the early evening were standing across the street from an apartment complex that had been the scene of several and varied criminal incidents. The State argues that the officers’ approach was merely the lowest tier of interaction — the first tier — for which they did not need even reasonable suspicion of criminal activity. The State’s argument fails, however, because the nature of the approach changed to that of an investigatory stop by the time Mr. Williams abandoned the bag of cocaine. The officers cited Mr. Williams’ brother’s decision to walk away as partial justification for stopping both brothers. If, as argued by the State, the officers’ initial approach was merely a first tier encounter (for which they did not need even reasonable suspicion of criminal activity), then Mr. Williams’ brother had the valid option of walking away.
 

 When Mr. Williams abandoned the bag of cocaine, he and his brother already had been confronted by at least two — possibly four — officers, and the officers had ordered Mr. Williams at gunpoint to remove his hands from his pockets. Mr. Williams complied with this order. When he did so, he abandoned the bag of cocaine. He submitted to the officers’ show of authority, and an actual investigatory stop — a second tier encounter — occurred.
 
 Handy, supra.
 
 In order to uphold the seizure of the cocaine, the court must find that the officers had reasonable suspicion to stop Mr. Williams before he abandoned the cocaine.
 

 
 *1215
 
 An officer may stop a person and question him if the officer has reasonable suspicion that the person has committed or is about to commit an offense. La.C.Cr.P. art. 215.1;
 
 State v. Temple,
 
 02-1895 (La.9/9/03), 854 So.2d 856;
 
 see also Terry, supra.
 
 Although reasonable suspicion is less than the probable cause needed to arrest, an officer “must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.”
 
 United States v. Cortez,
 
 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981);
 
 Temple,
 
 02-1895 at p. 4, 854 So.2d at 859-60. In discussing the standard to be used by a reviewing court to determine if an officer had reasonable suspicion to detain a suspect, the Louisiana Supreme Court in
 
 Temple
 
 stated:
 

 [Reviewing courts “must look at the ‘totality of the circumstances’ of each case,” a process which “allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that ‘might well elude an untrained person.’ ”
 

 Temple,
 
 02-1895 at p. 5, 854 So.2d at 860 (quoting
 
 United States v. Arvizu,
 
 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (quoting
 
 Cortez,
 
 449 U.S. at 417-18, 101 S.Ct. 690)). “Although reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires some minimal level of objective justification for making the stop.”
 
 State v. Morgan,
 
 09-2352, p. 4 (La.3/15/11), 59 So.3d 403, 406 (citing
 
 United States v. Sokolow,
 
 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).
 

 Factors to be considered in determining if the officers had reasonable suspicion to detain a suspect include the time of day and location of the stop, as well as the suspect’s actions before the stop, including any unprovoked flight by the suspect.
 
 Id.
 

 In
 
 Morgan, supra,
 
 the Louisiana Supreme Court concluded that the defendant’s unprovoked flight from an officer in a dimly-lit area at a late hour gave the officer reasonable suspicion to detain the defendant.
 

 Turning to the instant case, a consideration of the totality of the circumstances does not support a finding of reasonable suspicion to stop Mr. Williams. As noted, the officers stopped the brothers in the early evening across lnthe street from a complex that had been the scene of several and varied criminal incidents. The brothers were standing on the sidewalk engaged in a conversation. Mr. Williams already had his hands in his jacket pockets, a circumstance that was not that surprising given that it was cold outside. Although the officers initially intended merely to question the brothers (a first tier encounter for which the officers did not need reasonable suspicion of criminal activity), the brothers discontinued their conversation upon seeing the officers approach them, again not a surprising reaction. Upon seeing the officers approach them, Mr. Williams’ brother also exercised his right not to speak with the officers and apparently placed his hands in his jacket pockets as he walked away.
 

 Officer Humbles cited three factors that caused him to become suspicious of the brothers: (i) the high crime nature of the complex area, (ii) the brothers having their hands in their pockets, and (iii) Mr. Williams’ brother’s decision to walk away as the officers approached him. Officer Humbles testified that due to the high crime nature of the complex area, he was unsure if the brothers were the victims or perpetrators of a possible armed robbery. Likewise, Detective Rivet testified that the same three factors led him to believe that the brothers were hiding something, had
 
 *1216
 
 just committed a crime, or were about to commit a crime.
 

 It is difficult to conclude that the brothers’ actions — standing on the sidewalk and talking to each other, even if they had their hands in their pockets — reasonably could have led the officers to believe that the brothers were engaged in a purported armed robbery or any other type of criminal activity. Even Mr. Williams’ brother’s action of walking away as the officers approached does not fit within the ambit of “flight” from the officers, which could have been imputed to Mr. Williams as his companion if it had indeed been true flight.
 
 See State v. Williams,
 
 98-3059 (La.App. 4 Cir. 3/3/99), 729 So.2d 142 (finding that flight by a companion can be imputed to the remaining suspect in determining whether the officers had reasonable suspicion to stop the suspect who did not run). Although the complex had “no trespassing” signs posted, the brothers were standing on the other side of the street from the officers as the officers walked out of the complex.
 

 Counsel for the State has argued that the fact that Mr. Williams and his brother ended their conversation and walked away as the officers approached created reasonable suspicion that justified a
 
 Terry
 
 stop. We disagree. A citizen has the right, absent reasonable suspicion of criminal activity, to refuse to talk or to walk away from the police.
 
 Hamilton,
 
 09-2205 at pp. 4-5, 36 So.3d at 212-13. To suggest that the mere act of a citizen exercising that right creates reasonable suspicion that will justify an investigatory stop eviscerates the reasonable suspicion requirement as articulated in
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
 

 Summarizing, Mr. Williams abandoned the cocaine as a result of an investigatory stop. The State failed to show that the officers had reasonable suspicion of criminal activity to support the stop. Because the officers lacked reasonable suspicion to support the stop, the cocaine that Mr. Williams abandoned pursuant to the stop was required to be suppressed. Thus, the trial court’s ruling denying Mr. Williams’ motion to suppress the evidence is reversed.
 

 DECREE
 

 For the foregoing reasons, the defendant’s guilty plea and sentence are vacated; and the case is remanded for further proceedings.
 

 REVERSED AND REMANDED
 

 [1]
 

 . The dissenting judge, Judge Lombard, stated that ”[t]he defendant was unlawfully seized by the police officers’ showing of force when there was no reasonable suspicion of criminal activity. The defendant was walking away with his hands in his pockets, at which point the police officers drew their guns.
 
 See State v. James,
 
 07-1104 (La.App. 4 Cir. 3/5/08), 980 So.2d 750; La.Code Crim. Proc. Art. 215.1.”
 

 [2]
 

 . Fredrick Williams also pled guilty as charged, but he is not a party to this appeal. For ease of reference, we refer whenever possible to the appellant, Tedrick Williams, as Mr. Williams and to Frederick Williams as Mr. Williams’ brother.