# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-123

STATE OF LOUISIANA

VERSUS

RICKEY D. ARVIE

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 11349-08
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
### JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**John Foster DeRosier**
**District Attorney, 14th Judicial District**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**Counsel for Appellee:**
**State of Louisiana**

**Carla Sue Sigler**
**Assistant District Attorney, 14th Judicial District**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**Counsel for Appellee:**
**State of Louisiana**

**Mark Owen Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**Counsel for Defendant/Appellant:**
**Rickey D. Arvie**

**Rickey D. Arvie**
**Walnut 4-38**
**Louisiana State Prison**
**Angola, LA 70712**
**Pro Se**

**GREMILLION, Judge.**

Defendant, Rickey D. Arvie, was charged with and convicted of second degree murder arising from the shooting death of Tonya Majors, a violation of La.R.S. 14:30.1. Defendant was sentenced to life in prison at hard labor, without benefit of probation, parole, or suspension of sentence.

Defendant is now before this court on appeal. Defendant asserts that the trial court erred in denying his repeated motions to be allowed to represent himself at trial. He also argues pro se that the evidence at trial was insufficient to find him guilty beyond a reasonable doubt, that the trial court erred in denying his motions to suppress the evidence, and that the State made multiple prejudicial comments that violated fundamental fairness. We affirm Defendant's conviction and sentence.

At the outset we must dispense with one error patent. Defendant was told at sentencing he had two years from that date to file an application for post-conviction relief.

According to La.Code Crim.P. art. 930.8, the two-year prescriptive period for filing an application for post-conviction relief begins to run when Defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922. We, thus, instruct the trial court to inform Defendant of the correct prescriptive period of article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## MOTIONS TO REPRESENT HIMSELF

In his sole assignment of error filed by counsel, Defendant argues that the trial court erred in denying his repeated motions to represent himself at trial without a hearing pursuant to *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975). Defendant asserts that the trial court summarily forced him to continue to be represented by counsel he did not want and who had not been adequately representing him. Defendant also maintains that the deprivation of his right to self-representation was a structural defect not subject to a harmless error analysis, and thus, his conviction and sentence should be vacated and the case remanded for a new trial.

In *State v. Francis*, 07-373, pp. 3-4 (La.App. 3 Cir. 10/3/07), 966 So.2d 1096, 1098-99, this court stated:

> Louisiana Constitution Article 1, Section 13 and the Sixth Amendment of the United States guarantee a criminal defendant the right to assistance of counsel. While a defendant may represent himself, his choice to do so must be knowingly and intelligently made and the assertion of the right to self-representation must be clear and unequivocal. *State v. Brown*, 03-897 (La.4/12/05), 907 So.2d 1 (citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). The supreme court reiterated that a defendant must "ask clearly and unequivocally to proceed pro se." *Id*. at 22.

> With regard to a defendant's waiver of his right to counsel, a panel of this court has found that:

>> Before a defendant may waive his right to counsel, the trial court must determine whether the defendant's waiver of counsel is intelligently and voluntarily made, and whether his assertion of his right to represent himself is clear and unequivocal. *State v. Hegwood*, 345 So.2d 1179 (La.1977). The determination of whether there has been an intelligent waiver of the right to counsel depends upon the facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *State v. Harper*, 381 So.2d 468 (La.1980). Although a defendant should be made aware of the dangers and disadvantages of self-representation, there is no particular formula which must be followed by the trial

court in determining whether a defendant has validly waived his right to counsel. *State v. Carpenter*, 390 So.2d 1296 (La.1980). However, the record must establish that the accused knew what he was doing and that his choice was made "with eyes open." *Id.* at 1298, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

The Third Circuit Court of Appeal has repeatedly required that the trial court meet the following requirements in determining whether a defendant has validly waived his right to counsel: first, determine a defendant's literacy, competency, understanding and volition, i.e. was defendant's waiver of counsel made voluntarily and intelligently; and second, warn the defendant of the dangers and disadvantages of self-representation, so that the record establishes that the defendant knew what he was doing. [*State v.*] *Mitchell*, 580 So.2d 1006 [(La.App. 3 Cir.1991), *writ denied*, 613 So.2d 969 (La.1993)]; [*State v.*] *Smith*, 479 So.2d 1062 [(La.App. 3 Cir.1985)]; *State v. Adams*, 526 So.2d 867 (La.App. 3 Cir.1988); *State v. Sepulvado*, 549 So.2d 928 (La.App. 3 Cir.1989); and *State v. Bourgeois*, 541 So.2d 926 (La.App. 3 Cir.1989), *writ denied*, 572 So.2d 85 (La.1991).

*State v. Hayes*, 95-1170, pp. 4-5 (La.App. 3 Cir. 3/6/96), 670 So.2d 683, 685-86. *See also State v. Johnson*, 06-937 (La.App. 3 Cir. 12/6/06), 944 So.2d 864, and *State v. Whatley*, 03-655 (La.App. 3 Cir. 11/5/03), 858 So.2d 751.

Prior to trial, Defendant filed several pro se motions despite his representation by the Public Defender's Office. On January 9, 2009, Richard White, counsel for the Public Defender's Office, filed a motion to withdraw as counsel of record due to a conflict of interest. Prior to appointment of defense counsel Charles St. Dizier on January 22, 2009, Defendant requested via a pro se letter to Judge Clayton Davis dated January 13, 2009, to waive his right to counsel. On February 10, 2009, Defendant sent a second letter to Judge Davis, making the same request. A contradictory hearing was scheduled to be held on March 13, 2009, but there is no indication in the record that a hearing was held on that date. On December 7, 2009, Defendant filed a "Motion to Be Representative And Have Assistance." In his motion, Defendant asserted that he was capable of self-

3

representation, that he had the right to defend himself and have assistance, and that defense counsel had failed to investigate all of the possible avenues of defense that might help his case.

A contradictory hearing was held on the motion and several other pro se motions on March 26, 2010. At the hearing, Defendant indicated that he wanted to represent himself at trial, and the following discussion ensued:

THE COURT:

Why do you believe that that is in your best interest, sir, since you have counsel with you who's experienced in these kinds of serious cases?

MR. ARVIE:

We've been having lack of communication and this is a very, very serious allegation, and I feel that, you know, I have to prepare a defense, and we don't have any communications, then I won't feel - I won't feel right with having him represent me, but I do request his assistance.

THE COURT:

Well, let me get from you, Mr. St. Dizier, your -

MR. ST. DIZIER:

I might add, as a method of resolving that, there are two different investigators working on this case, there's some witness issues, there's a lot going on, and I have not communicated with him - with Mr. Arvie lately. Might I suggest that we withhold that motion, if I'm going to work with him anyway as an advisor or counsel we can - he can prepare to try the case next month and I can prepare to try the case next month and the Court can determine his best interests on trial date and it won't make any difference, I'll be ready and he'll be ready.

THE COURT:

His best interest is for you to be prepared to try the case and for him to assist you, not you assist him, because you can handle a jury trial and all the mechanics of it, so what we need to resolve is his feeling that there's communication.

MR. ST. DIZIER:

4

And, Your Honor, I don't - first of all, I don't take these things personally at all, and second of all, I would not - I do not find his feelings on that matter to be offensive or even unreasonable at this point because I have not been out to see him lately. He doesn't know everything we're doing on the case but that's - you know, that doesn't help him much if he's sitting in jail, so I sympathize with him.

THE COURT:

Okay. Anything you want to add on this?

MR. REGGIE:

I would just make sure that he understands the pitfalls of representing himself, Your Honor, the intricacies of the law as well as argument and procedures that Mr. St. Dizier is well versed in, evidenced by his appointment by this Court to numerous life case.

THE COURT:

Right.

MR. REGGIE:

The cases, the *Faretta* case, and I don't have it in front of me, I apologize, I don't have that in front of me, just to make sure that we touch base and make sure that he knows all those pitfalls and address those concerns.

THE COURT:

Yeah. The Court's not going to allow Mr. Arvie at this point to represent himself because he has extremely capable counsel on his case, and the issue is more one of trust and confidence, and you've got time between now and the date of trial to work on that part of it. But he's not presented anything substantive to bring into question either Mr. St. Dizier's inability to try the case, and he certainly has not - has no evidence to suggest that he would be nearly as capable. In fact, it would be a huge drawback for Mr. Arvie to attempt to represent himself in front of a jury. So, I'm going to allow them to work together. We'll revisit the issue during the trial week, and if there are some glaring problems at that time we'll just deal with it. But all I do is ask Mr. St. Dizier to work on the communication issue, primarily, because that would solve everything.

MR. ST. DIZIER:

That's correct, Your Honor, and -

THE COURT:

So we're just going to –

MR. ST. DIZIER:

- and even if we have a court order that I'm to assist him at trial, the result is the same, I have to prepare for trial, so -

THE COURT:

I agree.

MR. ST. DIZIER:

- it really matters not what today's ruling is, as far as how we conduct our business the next month.

THE COURT:

I'm going to deny any - well, he requests self-representation and assistance of counsel. I'm going to grant that with the caution that Mr. St. Dizier needs to be the lead in any presentation of evidence to the jury, for now. We can revisit it on April 19th.

Neither party objected to the ruling.

In a written order filed on March 29, 2010, the trial court stated:

The Motion to be Representative [sic] and Have Assistance relates to Petitioner's wish to represent himself at trial with the assistance of Mr. St. Dizier. The court determined that Petitioner and his counsel have had a communication issue. Mr. St. Dizier confirmed he would make Mr. Arvie more aware of his, Mr. St. Dizier's, work on the case and communicate with him more often as the matter proceeds to trial. A ruling on this motion is deferred to trial in anticipation it will resolve.

Mr. St. Dizier represented Defendant during his trial without reurging the motion. He was found guilty on April 23, 2010.

First, we note that in Defendant's written motion upon which the hearing was held, he did not request to represent himself, alone, but requested that he be allowed to represent himself with the assistance of defense counsel. As such, Defendant did not express a clear and unequivocal desire to represent himself. *Francis*, 966 So.2d 1096. Second, the trial court never denied Defendant's motion.

6

At the hearing, the trial court initially granted the motion, ordering defense counsel to lead in the presentation of any evidence to the jury. Defendant did not object to this ruling. Then in its written order filed three days after the hearing, the trial court deferred its ruling on the motion until trial to afford Defendant and his defense counsel the opportunity to resolve their communication issue. When trial began, Defendant did not reurge the motion or object to Mr. St. Dizier's representation of him at any time during trial. There is, therefore, no merit in this assignment of error.

## INSUFFICIENT EVIDENCE

By pro se assignment of error number one, Defendant argues that the jury's verdict was contrary to the law and evidence as there was insufficient evidence when viewed in a light most favorable to the prosecution for the jury to find him guilty of second degree murder. Defendant complains that the case is based purely on circumstantial evidence with no direct evidence linking him to the crime. He also asserts that the State's case was flawed by its failure to present evidence to disprove the victim's time of death as alleged by Defendant.

Defendant points to alleged inconsistencies in the State's case regarding: (1) the number of shots heard, the number of times the victim was shot, and the number of projectiles recovered; (2) the timing of phone calls made between Defendant and Aaron Harrison on February 10, 2008; and, (3) the time the incident occurred. Lastly, Defendant suggests that Theodore White, or one of several of his friends, is a more likely suspect.

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

7

proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

With regard to the use of circumstantial evidence, in *State v. Martin*, 11-32,

p. ___ (La.App. 3 Cir. 6/1/11), ___ So.3d ___, this court stated:

"Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983).

The statutory rule in evaluating the sufficiency of circumstantial evidence is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact

8

> should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Johnson*, 09-231, p. 6 (La.App. 3 Cir. 11/4/09), 21 So.3d 1159, 164, *writ denied*, 09-2643 (La.5/21/10), 36 So.3d 230 (quoting *State v. Chism*, 436 So.2d 464, 469 (La.1983)).

The jury convicted Defendant of second degree murder, defined in La.R.S. 14:30.1(A)(1) as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" While Defendant points to what he contends are inconsistencies or weaknesses in the State's case, the record contains more than sufficient evidence to support the conviction of second degree murder, particularly when viewed in the light most favorable to the State as required by the *Jackson* standard.

The record indicates that on the day prior to the offense, February 9, 2008, the victim had an argument over the phone with Defendant. Mindy Tezeno, the victim's first cousin, testified that she and the victim were at work together at the Prompt Succor Nursing Home in Opelousas, Louisiana, working the 2:00 to 10:30 p.m. shift. Tezeno stated that while they were eating together, about 8:00 p.m., the victim reported that she had a "little" argument with Defendant over the phone regarding the victim's involvement with White. According to Tezeno, the victim and Defendant were arguing because the victim had been talking to White on the phone. After work, Tezeno and the victim went to their aunt's house to pick up the victim's son. The victim then dropped Tezeno off at her home and proceeded to Crowley where she dropped off another sister, Marsha. After dropping off Marsha, the victim traveled to Defendant's home in Lake Charles because Defendant had something to talk about and wanted to see her. Around midnight, the victim called

9

Tezeno after arriving at Defendant's home and indicated to Tezeno that she was going to take a bath. This was the last time Tezeno spoke with the victim.

White admitted at trial to having a one-night stand with the victim, prompting a string of phone calls from Defendant and eventually a phone conversation. White testified that in February 2008, he traveled to Alabama to attend his grandmother's funeral. While in Alabama, White had several missed calls from Defendant and a voicemail. In the voicemail, Defendant told White he wanted to talk to him about something and instructed White to return his call. On February 9, 2008, White called Defendant and spoke to him for a few minutes at around 10:00 to 11:00 p.m. Defendant told White that he thought White and the victim had "hooked up." According to White, the conversation was not heated, but was "information-wise."

Detective Fondel interviewed White a few days after the offense and confirmed White was in Mobile, Alabama on February 9, 2008, and had received phone calls from Defendant that day. Upon his return to Lake Charles, officers were able to retrieve a message from White's phone from Defendant, which was introduced at trial and played for the jury. In the message, Defendant stated their friend, Aaron Harrison, had told him that White had been talking to the victim. The victim, however, had denied talking to White, and Defendant wanted to know who was telling the truth.

Theral King testified that he used to work with Defendant some time prior to the offense and was still friends around the time of the offense. On February 9, 2008, around 10:00 p.m., Defendant called King and was upset because the victim had slept with their mutual friend, White. King told Defendant he knew nothing

10

about it and that he needed to calm down. According to King, Defendant kept saying he was "gonna handle it" or "take care of it."

Catina Hodges testified that she was a friend of Defendant and had known him for about three to four months. On February 10, 2008, around 1:00 to 2:00 a.m., Hodges received about three phone calls from Defendant while she was at work but did not answer them. Defendant called her again around 5:00 a.m., and she answered his call. During their brief conversation, Defendant told her that he needed to talk to her. She did not speak to him long, however, because she was asleep when he called. The police called Hodges at about 6:30 a.m. and asked her to come get Defendant's baby.

Aaron Harrison testified that he worked with the Defendant at R & R Construction, talked to him on a regular basis, and socialized with him outside of work. On February 10, 2008, at about 2:00 a.m., Defendant called Harrison. However, when Harrison answered the phone, Defendant hung up. Harrison returned the call and asked why Defendant had called and hung up on him. Defendant responded, "Man, don't lay with me like that right now." Harrison asked him what was wrong, and Defendant replied, "I think I killed that girl." Harrison asked him what girl, and Defendant indicated it was the victim. Defendant asked Harrison to come to his house and check on his son.

Although Harrison told Defendant he would not go to his home, he got dressed and headed to Defendant's home. While in route, he spoke with Defendant again, and Defendant started telling him there was a girl that needed some help. Defendant said he was going to either kick in the door or push in the air conditioner. Harrison passed in front of Defendant's house but did not see anything out of the ordinary. He noticed that Defendant's bedroom light was on.

11

Harrison drove around the block, called Defendant, and told him, "Man, ain't nothing going on at your house, you know, there's nothing going on." Defendant then asked Harrison if he saw anyone, and Harrison told him he saw nothing. Defendant asked Harrison to hold on while he took another call, but Harrison hung up and proceeded home.

On his way home, Harrison spoke with Defendant again. Defendant told him he was going to go to Texas. Defendant also complained to Harrison about his hand hurting. When Harrison asked what was wrong with his hand, Defendant stated he accidentally shot himself in the hand. As Harrison got closer to home, he called Defendant a second time and asked him if he was "playing," and Defendant responded that he was "playing." This was the last conversation Harrison had with Defendant.

On cross-examination, Harrison testified he was aware of the controversy involving the victim and White. White had told him about it. Also, on either Thursday or Friday before the offense, Harrison had talked to Defendant about the victim and White. Harrison was not aware, however, of any hard feelings between Defendant and White. Also, Harrison was not aware of an ongoing relationship between the victim and White.

Detective Lecia McCullough of the Lake Charles Police Department, the lead detective in the matter, testified that a call to 911 was made by Defendant on February 10, 2008 at 6:04 a.m. Defendant advised the operator that someone entered his residence while he was taking a bath or shower and shot his wife. When Officers Joe Savoie and Harold Nevils arrived at the scene, they observed that the door had been pried or kicked open. When they entered the bedroom, Officer Savoie saw Defendant who appeared to be helping the female victim and a

12

male infant. The victim was lying in a fetal position and appeared dead. Detective McCullough arrived at approximately 6:30 a.m. and observed the victim in the bedroom, lying on the bed in a semi-fetal position on her back with gunshot wounds to her head and chest. The victim was wearing a scrub shirt and was naked from the waist down. Detective McCullough noted that the victim's blood appeared to be old and drying and was cracking in some spots. According to Detective McCullough, the victim's wounds and blood did not appear fresh, and her body had been there a while.

The victim's scrub pants were located in the bathroom, which was described by Detective McCullough to be in total disarray. The shower curtain and rod were down, a bullet hole was observed in the door and wall, and wet clothing was on the floor. The bathtub contained dirty water, and a diaper was in the water. The eighteen-month-old infant was not clothed. He appeared to have remnants of blood on his chest, and he had possibly been washed. The infant, however, was not wet.

The victim's car was located about two-and-one-half hours after the 911 call was received. Detective McCullough confirmed with the National Weather Service that the temperature was 50 degrees outside with 52% humidity. The hood of the victim's car, however, was still warm, and there was fresh mud on the tires and tire well. Brian Nash, the victim's next-door neighbor, testified that the victim's vehicle was usually parked in the front of the residence, not behind the nearby garage where it was found.

Officer Savoie observed that Defendant's shorts were soaking wet with water, and he had been shot in his left hand. Defendant reported he had been shot while trying to defend himself.

Officer Brian Brewton testified he entered the residence after it had been cleared for entry. He noted that the victim's blood had begun to coagulate—the corpuscles had begun to separate, and a clear, yellow fluid formed around the perimeter of the dark red blood. The clear, yellow fluid had begun to dry, and the blood had begun to soak into the bedspread or blanket upon which she was lying. Officer Brewton became suspicious that the offense did not occur when it had been reported.

Joey Jennings, a paramedic with Acadian Ambulance, testified that the victim was dead upon his arrival and had sustained multiple gunshot wounds to her head, abdomen, and chest. She was cool to the touch and rigor mortis had set in. Jennings estimated that the victim had been dead anywhere from three to four hours.

Detective Marcus McCullough with the Lake Charles Police Department took a video statement of Defendant at Lake Charles Memorial Hospital. According to Detective McCullough, Defendant reported he was at home with the victim and their baby when he heard a knock on the door. When he opened the door, a light-skinned, black male was standing at the door, raising something in his hand. Defendant tried to slam the door, but the intruder forced open the door and began firing shots. Defendant ran toward the bathroom, fell down, and closed his eyes while the intruder proceeded into the bedroom with the victim. Defendant heard shots while the intruder was in the bedroom with the victim. A short while later, the two came out of the bedroom and headed through the kitchen toward the living room. As they walked past him, he heard the victim utter, "Don't" and "that[s] not the truth."

14

Next, Defendant heard the baby start crying, and he jumped up and went in the bathroom with the baby and locked the door. Defendant then realized he had been shot in the hand. He waited for a while until he no longer heard anything and then opened the door and banged on the common wall between the duplexes. Defendant returned to the bathroom for a short period of time, and when he did not hear anything else, he ran to the next-door neighbor. When Defendant returned to the residence, he saw the victim's cell phone on the counter and called police. He then entered the bedroom, found the deceased victim on the bed, stepped back out of the bedroom, and waited for police to arrive. Defendant's video statement was then played for the jury.

Detective Lecia McCullough learned that Defendant and the victim were involved in a disagreement regarding a sexual relationship between the victim and White. After further investigation, she suspected Defendant had committed the offense, and he was arrested two days later while at the hospital.

Following his arrest, Defendant was transported to the police station where he gave a video statement, which was played for the jury. In this statement, Defendant's version of the events surrounding the offense was similar to his first interview at the hospital with the addition of several new facts. Most significant is that following the intrusion, Defendant stated that he hid in the bathroom with his son for forty to forty-five minutes. Additionally, after calling 911, Defendant ran to the victim's car with his son, retrieved drugs from the vehicle, and flushed them down the toilet. According to Defendant, the victim would get drugs from Randy, a guy she was "fooling" with. After flushing the drugs, Defendant and his son went to the victim and held her until police arrived.

15

When Detectives Fondel and McCollough began asking specific questions about his story, Defendant's answers were often evasive, and he tended to ramble. The detectives questioned Defendant about several inconsistencies in his story. First, Defendant's story did not account for about four hours between the time the victim bathed and the time he called 911. Defendant had stated that the victim arrived at 1:00 a.m. and had taken a bath about an hour later, after watching part of a movie. He did not call 911 until 6:04 a.m. When asked what happened during that gap in time, Defendant was unable to give an explanation. Also, based on Defendant's alleged timing of the intrusion, the subsequent forty minutes spent hiding in the bathroom, and the time he called 911, the victim's bath would have occurred around 4:00 a.m. or later. Moreover, if the intrusion occurred at 5:30 a.m. as reported by Defendant, there was not enough time for him to have spent forty minutes in the bathroom hiding before calling police at 6:04 a.m. Defendant had no explanation for the discrepancy in times.

Defendant could not explain why his phone records showed no phone calls made from his cell phone between 1:30 a.m. and 5:15 a.m. when he previously testified to making several phone calls to friends during that time. Defendant denied placing a call to Catina Hodges at 5:30 a.m., despite the fact that a call was found on his record. He also denied speaking to her when she returned his call shortly thereafter, although she reported speaking to him at that time. Defendant then admitted to calling her, however, to come get his son, but maintained he did not speak to her. He did not know why he decided to call Hodges to get his son when he had only known her a short time.

Additionally, Defendant denied getting into the victim's car, starting it, and moving it, even though the car was still warm when it was located by detectives.

Defendant maintained that he only went to the car to get the drugs, at which time he opened the driver's door and reached into the backseat to retrieve the drugs. According to Defendant, no one else had access to the victim's car.

With regard to the drugs, Defendant's story made little sense. Defendant stated that the victim did not care anymore for Randy, the man from whom she would get drugs, so Defendant told her to get the drugs from Randy and bring the drugs to him. Upon her arrival, the victim told Defendant she had the drugs in her car, but he did not get them at that time. Knowing that Randy liked the victim, he could not explain why he would send the victim to Randy to get the drugs for him.

Defendant claimed in his statement that the victim was the woman he loved second most. Despite his professed love for the victim, when the intruder made his way into the home, Defendant, a cage fighter, stayed down on the floor with his eyes closed instead of trying to protect the victim and his son. Defendant then ran and hid with his son and did nothing to help the victim, leaving her exposed and unprotected. Afterwards, Defendant showed more concern with disposing of the drugs than caring for the victim. Defendant's only remark with regard to his actions was that he was ashamed.

Detective Fondel confronted Defendant about his lack of emotion during his first interview at the hospital. Defendant maintained that he did not want to show his emotions during the interview. Lastly, Defendant denied calling Aaron Harrison at 3:00 a.m. when Harrison's testimony indicated that Defendant had called him.

Dr. Terry Welke testified that he retrieved a total of six large caliber projectiles from the victim—two from the skull, one from the facial jawbone, two from the spine, and one from the right back. Also, he estimated the time of death

17

to be approximately 5:00 a.m. Dr. Welke could not recall if this calculation was based in part on information received from law enforcement. The actual time of death could have been several hours before.

Detective Richard Harold testified he canvassed the neighborhood after the shooting and spoke with Lindsey Johnson, who lived across the street from Defendant. Johnson reported hearing approximately five gunshots between 1:00 and 1:10 a.m. At trial, Johnson stated that she did not respond to the gunshots because she did not want to get involved in the event. She just laid there and listened. Johnson could not tell from which direction the sounds were coming, but the sounds were close by.

Although the gun used in the offense was never recovered, the record indicates that Defendant owned a gun. First, Medena "Happy" Lewis testified she met Defendant in Opelousas in 2007, and they had a boyfriend-girlfriend relationship. Defendant then moved to Lake Charles, and she visited his apartment a number of times. According to Lewis, Defendant had an old handgun in his apartment. He told her if he ever wanted to kill her or commit a crime, he would use it because the police could not trace it.

White also testified he had seen a gun on a shelf in Defendant's bedroom closet. He never saw Defendant take it out or show it to anyone. Lastly, Harrison testified he had seen Defendant's gun in a few different places–behind Defendant's television, behind his dresser in the bedroom, and in his hand. He described the gun as an older, crack-barrel gun that opened in the middle.

Patrick Lane with the Louisiana State Police Crime Laboratory was tendered and accepted as an expert in the field of firearm identification. Lane testified he received and examined the bullets recovered from the victim. According to Lane,

the bullets were fired from a barrel that was either very worn or slightly oversized, causing slippage. Also, the bullets were consistent with a .44 or .45 caliber handgun. The bullet measurements and markings were entered into a firearms database maintained by the FBI laboratory to determine the make of the weapon used. Two possible firearms were identified—a British or U.K., a break action type of revolver seen in old British movies, or a Dan Wesson, a more modern, traditional type of revolver. A report of Lane's findings was admitted into evidence.

Although the State's case consisted of circumstantial evidence, the evidence was sufficient to show Defendant was the murderer. The evidence indicated that on the evening of the offense, Defendant was upset with the victim after learning of her sexual encounter with White. At his request, the victim traveled from Opelousas to Lake Charles with their infant son and arrived at Defendant's residence around midnight. The victim phoned her sister upon her arrival and stated she was going to bathe. About an hour later, a nearby neighbor heard several gun shots. Another hour later, Defendant called a friend and stated he thought he had killed a female victim. When police were summoned almost four hours later, both officers and emergency personnel noted that the victim's blood had begun to dry and rigor had set in, indicating that the victim died earlier than reported by Defendant.

Additionally, two-and-one-half hours after the 911 call was received, the victim's car was still warm, and wet mud was on the tires, indicating it had been driven in close proximity to the time of the call. The car was also parked in an unusual place, possibly to avoid detection. Lastly, the evidence also indicated that

19

Defendant owned an old gun which was consistent with the gun that fired the .44 caliber bullets retrieved from the victim's body and crime scene.

On appeal, Defendant raises several hypotheses of innocence that suggest someone else committed the offense or show he was not the perpetrator. These hypotheses were not presented at trial for the jury's consideration, and thus, we decline to consider them here.

Considering all the facts established by the evidence presented at trial, a rational jury could reasonably conclude that Defendant became enraged after learning of the victim's sexual infidelity with his friend and then shot her to death with the gun he was known to possess. Defendant offered no reasonable hypothesis of innocence, and there was no evidence to support Defendant's claim that someone else committed the murder. While none of the facts standing alone would suffice to prove the State's case, the evidence considered in a light most favorable to the prosecution is sufficient to prove beyond a reasonable doubt that Defendant committed the second degree murder.

## MOTIONS TO SUPPRESS EVIDENCE

By pro se assignment of error number two, Defendant argues that the trial court erred in denying his motions to suppress the evidence. Defendant contends that the confiscation of his cell phone was the product of an illegal search and seizure.

A Motion to Suppress was filed by defense counsel on June 9, 2008, wherein Defendant complained, in part, that items were taken from his home prior to his arrest and without a warrant. At a hearing held on June 25, 2008, counsel for Defendant asked to pass on the motion without a date.

20

The motion was then reurged by defense counsel, and a hearing was held on October 22, 2008, addressing the seizure of the cell phones. At the hearing, Detective Lecia McCullough testified that the Defendant called 911 on February 10, 2008, and reported that an unknown black male had broken into his house and shot his wife. He also stated he had been shot in the hand. Upon Detective McCullough's arrival, the crime scene had been roped off, the victim was lying on the bed, and Defendant had been transported to the hospital. Defendant was considered to be a victim at that time, and he was not placed under arrest at any time during the seizure of evidence. During the course of her investigation, evidence was seized from the residence, including a black Motorola phone and a pink cell phone. Detective McCullough could not recall where the phones were located. According to Detective McCullough, they had spoken to some of the victim's family members who reported that the victim had received a phone call and prompted the seizure of the phones. Since they did not know which phone belonged to the victim, both phones were seized as potential evidence.

On cross-examination, Detective McCullough testified that during her investigation, there was no living adult in the residence from whom she could have obtained consent to inventory items. Also, there was no land line inside the residence, and thus, Defendant had to place the 911 call from a cell phone. After obtaining search warrants to retrieve information from the cell phones, Detective McCullough discovered individual phone numbers, and she learned that Defendant's 911 call originated from one of the seized phones.

In support of his argument, Defendant referred the trial court to several cases. First, in *State v. Gibson*, 391 So.2d 421 (La.1980), the defendant's coat was seized from the closet of his motel room after he was arrested. In finding that the

21

State's effort to justify its warrantless seizure fell short, the supreme court stated that three conditions must be satisfied for a warrantless seizure to fall under the plain view rule:

> (1) there must be a prior justification for an intrusion into a protected area; (2) in the course of which evidence is inadvertently discovered; and (3) where it is immediately apparent without close inspection that the items are evidence or contraband. *State v. Banks*, 363 So.2d 491 (La.1978); *State v. Parker*, 355 So.2d 900 (La.1978).

*Id*. at 425. The court concluded that the intrusion of officers into the motel room, knowing there was more than one occupant, was not justified following the defendant's arrest.

Relying on *Gibson*, Defendant argued he was considered a victim at the time of the seizure, he had ownership over the residence, and he placed the 911 call. No one, however, gave officers consent to seize the cell phones, and the cell phones were seized in the event something else may develop as a result of the seizure.

Defendant then referred to *State v. Tucker*, 626 So.2d 707 (La.1993). In *Tucker*, police were conducting a drug sweep of an area when the defendant and another man were seen huddled together by a parked car. When the two men observed the police, they separated and began to leave the scene. After police ordered the men to halt, the defendant took several steps and then tossed a bag before surrendering to police. The bag was retrieved by police and contained forty-seven rolled marijuana cigarettes. On appeal, the court found that the defendant had been seized when ordered to "halt" and "prone out." The court surmised that the commands would cause a reasonable person to believe detention was imminent. The court then concluded that police lacked reasonable, articulable suspicion that the defendant was engaged in, was about to engage in, or had just completed engaging in criminal conduct at the moment he was seized. As such,

22

the court found the seizure was unconstitutional, and the discarded plastic bag and its contents were inadmissible.

The supreme court adopted the definition of an "actual stop" set forth in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547 (1991). An "actual stop" of an individual has not occurred when a police officer yells "Halt!" at a fleeing form that continues to flee. "[A]n individual is not 'seized' *within the meaning of the Fourth Amendment* until that individual either submits to the police show of authority or is physically contacted by the police." *Tucker*, 626 So.2d at 711. The supreme court also adopted a standard for determining the "imminency" of an actual stop—whether an "actual stop" is virtually certain to result from an encounter with police.

Relying on this jurisprudence, Defendant argued that the problem with the seizure of the cell phones was the delay in getting a warrant and the determination of whether or not the cell phone used to call 911 could have led to the development of leads. Defense counsel added, "I know I haven't given you enough to rule in my favor, but I'm trying to set the stage for something in the future."

The State responded that the jurisprudence was distinguishable from the instant case. In the cases cited, the defendants were suspects, whereas Defendant herein was considered a victim at the time of the seizure. The State added that Defendant invited officers into his home by making the 911 phone call. When officers arrived, they seized whatever evidence they found that was relevant to their investigation, including the two cell phones. Additionally, the State maintained that Defendant did not have a reasonable expectation of privacy from the seizure of all phones, items of evidence of the commission of a crime.

In denying the motion, the trial court reasoned:

23

THE COURT:

All right. Well, I see it a little differently. First of all, Mr. White, I think the seizure of the phones, even if I were to rule in your favor, does not prevent the seizure of the records. The phones are physical entities. It's the records of those phone calls that are really the issue, or it is the records themselves that would lead to some sort of furthering of the investigation, which they -- the police inevitably could have recovered at any time, especially when there were threats made – if we believe the officer, there were threats made.

But the cell phones in and of themselves are practically useless. It's the information contained within the cell phones that is important, and those would be subject to – if there were, in fact, threats to the police – getting records of those from the phone company, which are done all the time to see if they could come up with leads or suspects or something to that effect.

And I agree with Mr. Reggie that he wasn't a suspect at this time. But that being the case, I think the police didn't actually need the physical cell phones themselves, and it wasn't the cell phones that led to this information. It was actually information that they could readily obtain and gotten a warrant for, which is really more relevant as opposed to the physical nature of the phones themselves.

A second "Motion to Suppress" was filed pro se on January 12, 2009, wherein Defendant asserted that the State intended to introduce as evidence at trial tangible items including videos, diagrams, bullets, clothing, drawings, etc., that were seized without a warrant. The court minutes dated April 29, 2009, indicate that the motion to suppress was heard. Counsel for Defendant stated he had not yet received the case file from the Public Defender's Office. The minutes do not reflect whether the trial court ruled on the motion or if defense counsel passed or withdrew the motion. The minutes indicate that defense counsel adopted the Defendant's pro se motion for a speedy trial that was filed with the pro se motion to suppress. On April 30, 2009, Defendant filed a pro se "Amendment to Motion to Suppress filed 1/12/09."

On September 9, 2009, the trial court signed an order denying Defendant's motion to suppress as repetitive. Defendant subsequently sought a writ of review

24

in this court on November 17, 2009. Prior to this court's ruling on the writ application, on December 7, 2009, Defendant refiled his pro se "Motion to Suppress the Evidence," seeking to suppress evidence seized or obtained as the result of an unlawful warrantless search. He also refiled his "Motion to Exclude Evidence" and "Motion for Speedy Trial."

After considering Defendant's writ application, this court ruled:

> **WRIT DENIED:** From the writ application of Defendant and the information obtained from the trial court clerk's office, it is not clear that the trial court has ruled on Defendant's "Amendment to Motion to Suppress Filed 1/12/09" or his "Motion to Exclude Evidence." Even if the September 9, 2009 denial encompasses the above-referenced motions, Defendant failed to brief his assignment of error as required by Uniform Rules–Courts of Appeal, Rule 2-12.4. Accordingly, the writ application is denied.

*State v. Arvie*, an unpublished writ ruling bearing docket number 09-1395 (La.App. 3 Cir. 2/25/10).

On March 11, 2010, the trial court filed "Written Reasons and Order," denying Defendant's motion to suppress, motion to exclude evidence, and motion for speedy trial. With regard to the motion to suppress, the trial court stated:

> C.Cr.P. art. 702 states that an evidentiary hearing on a motion to suppress shall be held only when the defendant alleges facts that would require the granting of relief. Petitioner has not alleged any facts which would warrant a hearing on the matter. Accordingly, the Motion to Suppress the Evidence is DENIED.

That same day, Defendant refiled his motion to suppress along with several other motions. In an order dated April 15, 2010, the trial court denied Defendant's motion to suppress, stating:

> The record reflects that similar motions were filed by and on behalf of [defendant] on June 9, 2008, January 12, 2009, April 30, 2009, and December 7, 2009. Similarly, this court held contradictory hearings on Motions to Suppress in this matter on October 22, 2008 and April 29, 2009. Accordingly, **IT IS HEREBY ORDERED** that the Motion to Suppress be DENIED as MOOT.

25

On the first day of trial, April 19, 2010, a hearing on Defendant's pro se "Motion to Suppress" filed on March 19, 2010 was held prior to jury selection. The trial court stated it had previously denied the motion as moot on April 15, 2010. Defendant objected to the ruling. The trial court then noted that Defendant sent the motion to the trial court without filing it. One copy was sent to the trial court, and another copy was sent to the clerk. At that time, the trial court filed the motion and the order denying the motion, and the motion was heard. With regard to the cell phones, the State urged that the trial court previously ruled that the cell phones were properly seized and were not suppressible. Defense counsel concurred with regard to the cell phones, and the hearing proceeded on the seizure of the notepad.

Although the issue of the notepad is not before this court on appeal, the argument regarding its admissibility is interrelated with the admissibility of the cell phones. On cross-examination at the hearing, Detective Lecia McCullough testified that a search warrant was not obtained for Defendant's residence. When asked to describe any exigent circumstances that prevented police from obtaining a search warrant, Detective McCullough stated that a homicide was involved with both the deceased and Defendant, who had been shot in the hand, located inside the residence. She described it as a "continuous crime scene" from the time they arrived, and they collected evidence to investigate the crime. The crime scene was secured from the time the initial officer arrived, and the integrity of the scene was not threatened. According to Detective McCullough, it is not standard practice to obtain a search warrant for a crime scene when officers are there from the start and never leave the location. On re-direct, Detective McCullough confirmed there was a chance of contamination, but the crime scene was "well in hand."

26

The State subsequently argued that with regard to the 911 call, Defendant invited law enforcement to the residence, saying he and his wife had been shot. As such, the State maintained there was no expectation of privacy. In response, Defendant argued that while law enforcement is given wide latitude at a crime scene, there is no specific crime scene exception. Defendant maintained that a warrant was required for the secured crime scene as there was no threat to the degradation of evidence. Further, Defendant contended that only a minimal intrusion on the convenience of officers was necessary to obtain a warrant, and there were no exigent circumstances to justify proceeding without a warrant. As such, Defendant concluded that anything seized at the crime scene without a warrant from the time officers arrived was inadmissible.

The motion was denied, and Defendant requested written reasons from the trial court. The trial court complied, and on April 21, 2010, a written "Ruling Denying Motion to Suppress" was filed. The ruling reads in pertinent part:

> A hearing on these matters was held on April 19, 2010. A police detective testified and established that petitioner called 911 to report a shooting at his residence on February 10, 2008. Petitioner's girlfriend was killed in the shooting. Petitioner himself sustained an injury and was taken to the hospital. Petitioner claimed an unknown intruder did the shooting. Law enforcement arrived at the scene and spent hours collecting evidence. The uncontradicted testimony established that petitioner was not a suspect during this time.

Defendant consented to the search at his residence by calling 911, reporting the crime, and seeking assistance. *State v. Dowling*, 387 So.2d 1165 (La.1980); *State v. Brady*, 585 So.2d 524 (La.1991) and *State v. Simmons*, 996 So.2d 1177 (La.App. 5 Cir. 2008). The *Brady* facts are very similar to this case and strongly support the denial of the motion to suppress. Defendant's own motion admits he called 911 "for help and assistance."

27

In *State v. Dowling*, 387 So.2d 1165 (La.1980), the supreme court found that a warrantless search and seizure was justified when both the defendant and his wife called the operator or city police to request medical aid for the victim of a shooting that had occurred in his home. The wife met police outside the home and directed them into the house, giving them directions to the room where the shooting occurred and where the victim could be found. The defendant watched silently as police entered his home. After the victim was pronounced dead, the defendant was arrested and taken to police headquarters. Investigators then searched the home for bullets and found several markings thought to be bullet holes, including one in the ceiling. A deputy then entered the attic looking for the bullet and discovered marijuana being cultivated in pots. The marijuana was then seized.

The supreme court found that the defendant and his wife gave their consent to police to search their home in the investigation of the shooting when they requested the presence of police and did nothing to retract or limit their consent to investigate. Further, the court found that the deputy was legitimately in the attic in search of bullet holes and bullets, and thus, the "plain view exception" was applicable.

> The 'plain view exception' (it is reasoned that there is no search where this exception is applicable) allows evidence found and seized without a warrant to be used against defendant where: (1) there is a prior justification for police intrusion into a protected area; (2) the evidence is discovered inadvertently; (3) it is immediately apparent without close inspection that the items are evidence or contraband. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Fearn*, 345 So.2d 468 (La.1977).

*Id*. at 1169.

In *State v. Brady*, 585 So.2d 524 (La.1991), the defendant called police to report a stabbing and requested that officers be dispatched to her apartment. Upon

the arrival of officers, the defendant answered the door and allowed their entry in to the apartment. The defendant reported that the victim had been stabbed in another residence before staggering into her apartment and collapsing in the hall. While standing near the victim's head, a detective observed a bloody towel in the nearby lavatory and blood on the handle of a closet door. When he opened the closet door, he discovered a pair of bloody scissors and a bloody shirt. The defendant was then arrested, and she subsequently admitted to stabbing the victim. The trial court suppressed the evidence, stating there was no crime scene exception to the seizure of the evidence, and thus, police had no authority to search the closet without a warrant or a more positive showing of consent to search the closet.

In finding that the evidence was admissible, the supreme court reasoned:

> Probable cause to search exists when a reasonable police officer has cause to believe, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *State v. Kyles*, 513 So.2d 265 (La.1987).

> The probable cause standard is a practical, non-technical concept. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Dealing with probable cause involves dealing with probabilities which are not technical, but are "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*, at 175, 69 S.Ct. at 1310. "[P]ractical people formulate certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Evidence collected by law enforcement officers must be viewed and weighed, not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. *Id.* Probable cause is a fluid concept, turning on the assessment of probabilities in particular factual contexts and not readily reduced to a neat set of legal rules. *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

> In the present case it was evident that a homicide had been committed with a knife or similar weapon a short time before Detective Demma arrived at the scene. When Detective Demma saw

29

the bloody towel in plain view in the bathroom lavatory near the body and further saw blood on the handle of the closet door next to the lavatory, a reasonable person versed in the field of law enforcement could have formulated a reasonable conclusion that there was a fair probability evidence relating to the stabbing would be found inside the closet. Clearly, the existence of probable cause was established by the evidence. *Id*. at 526.

In *State v. Simmons*, 08-269 (La.App. 5 Cir. 10/28/08), 996 So.2d 1177, *writ denied*, 09-15 (La. 9/25/09), 18 So.3d 81, the defendant was charged with the stabbing death of the victim. At the time of the offense, the defendant was living with his ex-wife and several family members, including two of his ex-wife's daughters, one of which was the victim. The other daughter had gone to work, leaving her children in the care of the victim. When she returned home, her two-year-old son was in the window crying. When she opened the door, she observed a puddle of blood in the home and ran next door to call police. When police arrived, they observed a trail of blood leading to a closet. An officer opened the closet door and saw the victim's arm from underneath a piece of clothing and a blanket. Several items were collected from the scene, including a bloody kitchen knife, a pair of panties and shorts covered with blood, and a second pair of shorts. A bloody palm print was cut from a kitchen cabinet that was later matched to the Defendant, leading to his arrest. A search warrant was obtained the day after the murder.

On appeal, the defendant argued that police improperly searched his home without a warrant, taking twelve items from the home. The court found, however, that a resident of the home not only consented, but actually requested that the police enter the home. The court noted that in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408 (1978), wherein the Supreme Court expressly rejected any doctrine of a "murder scene" exception, the Supreme Court did not address a situation where an

30

occupant of the premises had summoned police and approved of the investigation. Because the defendant's bloody palm print on the kitchen cabinet was in the officers' plain view during the lawful entry, the court concluded that the police entry and seizure of forensic evidence was supported by the lawful consent of a resident.

The court in *Simmons* also addressed the issue of exigent circumstances, finding that the exception to a warrant requirement applied to the case. The court stated:

> The Supreme Court of the United States identifies exigent circumstances as "a plausible claim of specially pressing or urgent law enforcement need." *Illinois v. McArthur*, 531 U.S. 326, 331, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001). The Supreme Court of Louisiana has further explained that "[e]xigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment." *State v. Brisban*, 00-3437, p. 5 (La.2/26/02), 809 So.2d 923, 927, emphasis added.
>
> The Supreme Court has affirmed the right of police to make warrantless entries into premises where the officers "reasonably believe that a person within is in need of immediate aid. . . . ." *Mincey*, at 392, 98 S.Ct., at 2413. Police officers are also authorized to make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. *Id.*

*Id.* at 1185.

On appeal, Defendant in the instant case argues that the warrantless search and seizure of his home was not justifiable simply because a homicide had occurred there or because of a detective's purported reason to need the victim's phone without proof of such need. The record indicates, however, that Defendant consented to the entrance of the officers on the premises to render emergency aid to Defendant and the victim. As such, the officers were justified for their intrusion into Defendant's residence as required in *Dowling*, 387 So.2d 1165. The record

31

also indicates that the two cell phones seized were in plain sight, the second requirement in *Dowling*. A black Motorola cell phone was located on top of a burner on the stove in the kitchen, and a pink cellphone was found on the bed near the victim. Lastly, it was immediately apparent that the cell phones were evidence in the matter, one of which was used to place the 911 call for help.

Without any evidence to show that anything was moved to provide visual access to the items seized or that an expansive search occurred upon the arrival of officers and emergency personnel, the cell phones that were in plain view were admissible, and thus, the trial court did not err in denying Defendant's motion to suppress.

## PREJUDICIAL COMMENTS

Defendant's third assignment of error contends that the State made multiple prejudicial comments. He argues that the State wrongly told the jury that 150 pieces of evidence had been found that proved he was guilty. He argues that the State vouched for the credibility of each of its witnesses. As such, Defendant maintains the State violated fundamental fairness, citing *U.S. v. Whitmore*, 480 F.2d 1154 (D.C. Cir. 1973). Further, Defendant asserts that courts have firmly condemned statements by the prosecution that suggest or might lead a jury to believe that other evidence of a defendant's guilt existed but was not presented. *U.S. v. McPhee*, 731 F.2d 1150 (5th Cir. 1984).

In *Whitmore*, the State indicated in its closing argument to the jury that it had information and an affidavit stating the defendant was selling heroin, although such evidence had not been introduced into evidence. The court found that the State's conduct was not isolated but was a deliberate effort to prejudice the defendant.

In the instant case, the State's closing argument reads in pertinent part:

As the officers testified, they were initially investigating a shooting and the murder, a homicide, initially. So, when they got there, they do what normal police officers do when they're doing good work, they start looking for any type of evidence that they can seize because they don't know exactly what kind of crime scene they have. So anything out of the ordinary, they start collecting, and they collected in this case over a hundred and – right around a 150 pieces of evidence. Now, you didn't see it all, and there's a reason for that and I'm going to explain to you about that. But they started collecting anything that could possibly be used in their investigation. Good police work. Mr. St. Dizier asked yesterday to Sergeant Brewton, well, why didn't y'all do a test on the striker plate? What would that have proven? What kind of test would they have done? He asked Detective McCullough, Lecia McCullough, why didn't y'all do any analysis on the mud that was found on Tonya's car, parked behind the house? They have to compare it to something. They have to have some mud from somewhere. They didn't know where the car had been to test it to. The tracks were obvious in the -- in the yard behind the house, the lot behind the house. It was clear that a reasonable person can expect that that mud on that car came from when it was driven in that lot. We don't have to prove where it came from. There's nothing to compare it to. So there was an analysis done on a lot of evidence that we didn't give to you in this particular case. There were blood tests made by the crime lab, but they were inconclusive and they had no evidentiary value.

Defendant objected, asserting that the State was arguing facts not in evidence. Following a bench conference that was not recorded, Defendant's objection was sustained.

Although Defendant correctly asserts that the State referred to evidence not admitted at trial, the State's argument, read as a whole, stresses that an in-depth investigation was carried out with the collection of a substantial amount of evidence. The prosecutor was clearly not arguing that all the unseen evidence proved Defendant's guilt. On the contrary, the State made it plain that much of the evidence to which it referred was "inconclusive" and "had no evidentiary value."

Unlike the facts in *Whitmore,* the State did not claim that the 150 pieces of evidence obtained during the investigation, but not introduced at trial, showed he

33

was guilty. There was no deliberate effort to unfairly prejudice Defendant. This assignment of error is without merit.

**DECREE**

Defendant's conviction and sentence are affirmed. The trial court is ordered to inform Defendant of the correct prescriptive period of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTIONS.**